ACCEPTED
03-15-00044-CV
6433766
THIRD COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 5:02:05 PM
JEFFREY D. KYLE
CLERK

## No. 03-15-00044-CV

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
8/10/2015 5:02:05 PM
JEFFREY D. KYLE
Clerk

IN THE COURT OF APPEALS
FOR THE THIRD JUDICIAL DISTRICT
AT AUSTIN, TEXAS

TEXAS DEPARTMENT OF CRIMINAL JUSTICE,
*Appellant/Defendant*,

*v.*

MAURIE LEVIN, NAOMI TERR, AND HILARY SHEARD,
*Appellees/Plaintiffs.*

# APPELLEE'S BRIEF

MAURIE LEVIN
State Bar No. 00789452
211 South Street, Suite 346
Philadelphia, PA 19147
(512) 294-1540
(215) 733-9255 (FAX)
maurielevin@gmail.com

DEATS DURST & OWEN, P.L.L.C.
1204 San Antonio Street, Suite 203
Austin, Texas 78701
(512) 474-6200
(512) 474-7896 (FAX)
Philip Durst
State Bar No. 06287850
pdurst@ddollaw.com
Manuel Quinto-Pozos
State Bar No. 24070459
mqp@ddollaw.com
COUNSEL FOR APPELLEE

**ORAL ARGUMENT REQUESTED**

## IDENTITY OF PARTIES AND COUNSEL

| APPELLEE/PLAINTIFF | TRIAL & APPELLATE COUNSEL |
|---|---|
| **MAURIE LEVIN, NAOMI TERR AND HILARY SHEARD** | Philip Durst<br>Manuel Quinto-Pozos<br>DEATS DURST & OWEN, P.L.L.C.<br>1204 San Antonio, Suite 203<br>Austin, Texas 78701<br><br>Maurie Levin<br>Texas Bar No. 00789452<br>211 South St., #346<br>Philadelphia, PA 19147 |

| APPELLANTS/DEFENDANTS | TRIAL & APPELLATE COUNSEL |
|---|---|
| **TEXAS DEPARTMENT OF CRIMINAL JUSTICE** | Richard B. Farrer/Adam Ashton/ Joseph Hughes<br>Nichole Bunker-Henderson/ David Alan Harris<br>OFFICE OF THE TEXAS ATTORNEY GENERAL<br>P.O. Box 12548<br>Austin, Texas 78711-2548 |

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ............................................................i

TABLE OF CONTENTS................................................................................ ii

INDEX OF AUTHORITIES.........................................................................iv

STATEMENT OF THE CASE.......................................................................vi

ISSUES PRESENTED................................................................................ vii

STATEMENT OF FACTS ............................................................................1

SUMMARY OF ARGUMENT .....................................................................11

STANDARD OF REVIEW ..........................................................................12

ARGUMENT & AUTHORITIES ..................................................................14

  I) THE DISTRICT COURT CORRECTLY DETERMINED THAT TDCJ
     DID NOT DISCHARGE ITS HIGH BURDEN TO ESTABLISH A
     SUBSTANTIAL THREAT OF PHYSICAL HARM......................................14

    A) The Supreme Court Set the Burden for Secrecy Very High........................14

      1) What the Standard Is. ............................................................14

      2) What the STPH standard is not. ................................................15

    B) None of the Three Items That TDCJ Relies Upon Establishes a STPH.....18

      1) The comments to the Woodlands Pharmacy website are simply
        people expressing their opinions on the death penalty and cannot
        be used to create a STPH....................................................18

      2) The clip art on a website from France cannot be used to create a
        STPH. ..............................................................................20

3) A Retired College Professor in Ohio's e-mail to an Oklahoma Pharmacy that Once Provided LIDs to Missouri Does Not Create STPH. ....................................................................................24

C) TDCJ's experts offer nothing beyond their "spin" on the three documents and thus do not create a STPH......................................26

1) TDCJ's Witnesses Do Not Permit a Finding of a "Substantial Threat of Physical Harm"...................................................................27

2) A Threat Assessment is an Actual Thing, Not an Opinion.................31

3) Giving up the ghost: TDCJ's expert admits that his opinion does not really involve any of the documents in the record........................36

4) Plaintiffs' expert provided actual content and context for his opinion....................................................................................40

D) A final word about the 2015 legislative change. ........................................43

PRAYER.................................................................................................44

CERTIFICATE OF COMPLIANCE....................................................................46

CERTIFICATE OF SERVICE ..........................................................................46

# INDEX OF AUTHORITIES

**Cases**

*Arkoma Basin Exploration Co. v. FMF Associates,* 249 S.W.3d 380 (Tex. 2008) ...................................................................................................28

*Bell v. Lee*, 49 S.W.3d 8 (Tex. App.—San Antonio 2001, no pet.) ........................13

*Broden v. TDCJ*, No. D-1-GN-10-004493 (Jan. 10, 2011) ........................................3

*Burrow v. Arce*, 997 S.W.2d 229 (Tex. 1999) ........................................................28

*City of San Antonio v. Pollock*, 284 S.W.3d 809 (Tex. 2009) ................................29

*E.I. DuPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549 (Tex. 1995) ...........27

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999)....................................29

*Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546 (Tex. 1985) ................................13

*Texas Department of Public Safety v. Cox Newspapers, L.P.*, 343 S.W.3d 112 (Tex. 2011) .....................................................................................................passim

**Statutes**

TEX. GOV'T CODE §552.021.......................................................................................13

TEX. GOV'T CODE §552.022(a)(3) ........................................................................3, 13

Tex. Gov't. Code §552.022(b)...................................................................................13

Texas Public Information Act, Tex. Gov't Code §552.1081............................passim

**Other Authorities**

"Firestorm," Merriam-Webster Dictionary (online ed.): http://www.merriam-webster.com/dictionary/firestorm (last visited 8/8/15) ........................................38

"Justin Bieber causes firestorm after suggesting that Anne Frank would be a 'Belieber.'" http://www.worldwideweirdnews.com/2013/04/26676.html (last visited 8/8/15) ...............................................................................................39

Harvey Brown & Melissa Davis, *Eight Gates for Expert Witnesses: Fifteen Years Later*, 52 Hous. L. Rev. 1 (2014) ...............................................28

Tex. Op. Att'y Gen. ORD1977-0169 ......................................................14

Texas Attorney General Open Records Letter No. OR2010-17507.........................3

Texas Attorney General Open Records Letter No. OR2012-10208.........................4

# STATEMENT OF THE CASE

*Nature of the Case:*        This is a Public Information Act (open records) case in which plaintiffs (three established *pro bono* death penalty lawyers) sought information on the protocols used to execute inmates by TDCJ. TDCJ refused to produce public information regarding the supplier of Lethal Injection Drugs (LIDs) by trying to fit within a narrow exemption in the Act, which allows a government body to withhold information if, and only if, it can establish that releasing this information would cause a **"substantial threat of physical harm."** The issue is whether TDCJ discharged that high burden with vague and unspecific concerns about "radical fanatics" or that suppliers will stop selling these drugs to TDCJ if their identities are known. (Statutory material is collected in **Appendix 2)**

*Trial Court:*        210st District Court of Travis County (Hon. Darlene Byrne)

*Trial Court's Disposition:*        Each side agreed to file cross-motions for summary judgment. The Court found that, on this record, TDCJ did not meet its burden to establish a "substantial threat of physical harm" and granted plaintiffs' motion (and denied defendant's motion). (*CR@2297*; **Appendix 1**). By agreement of the parties, the trial court severed the remaining issues on attorney's fees and costs, making its "merits determination final and appealable. CR@*2305-06*.

# ISSUES PRESENTED

1. Under the Public Information Act, a government agency may keep secret and fail to disclose information that it can establish would create a "**substantial threat of physical harm**." The Supreme Court has established this is a high burden and cannot be discharged with "vague assertions of risk." The District Court correctly determined that TDCJ had not discharged that burden, on this record, with its general concerns that LID suppliers might not continue to sell to TDCJ if they got bad publicity or because of possible and speculative "radical fanatics."

2. Can TDCJ rely upon the conclusory and unsubstantiated opinions of its alleged "experts," when no history or actual violence against a supplier of Lethal Injection Drugs has ever occurred or been threatened?

## STATEMENT OF FACTS

### *The Public Information Act Request*

Plaintiffs/Appellees are three established *pro bono* death-penalty attorneys who requested public information from Texas Department of Criminal Justice ("TDCJ") under the Texas Public Information Act ("TPIA"("TPIA" or "the Act"). Plaintiffs requested information about: (1) the drug(s) that would be used to carry out the executions of two of their death-penalty clients; (2) the source of the drug(s) to be used; and (3) testing conducted on said drugs to ensure potency, and purity.[1]

This information is important to these requestors, both in terms of representing their death-penalty clients and also as members of the public, because of the recent issues involving the changes in Lethal Injection Drugs ("LIDs") and botched executions.

### *Public Information on Lethal Injection Drugs*

As our record shows, the information requested is vitally important because, in the past few years, Departments of Corrections around the country (including TDCJ) have changed their method of obtaining LID's (including the pentobarbital

---

[1] When this case began, the plaintiffs were the three *pro bono* capital punishment lawyers (Maurie Levin, Naomi Terr and Hilary Sheard) and two death-row inmates (Ramiro Hernandez Llanas and Tommy Lynn Sells). CR@5-6. During the pendency of this case, the two inmates have been executed, leaving the *pro bono* lawyers as the only plaintiffs/appellants.

1

that TDCJ uses). TDCJ and other states have decided to obtain these drugs from (what are known as "compounding pharmacies"), which largely operate outside of FDA oversight, giving rise to concerns about where the compounded pentobarbital comes from and how it was prepared. In Texas, and elsewhere, it now takes longer for the drugs to "work" and there have been a series of botched executions. CR@754-55. The recently botched executions in Oklahoma, Ohio and Arizona were carried out with LIDs from new and unreliable sources. CR@755-56. As such, this information is important to ensure that executions using those drugs will be carried out in a manner that comports with the Constitution and the awesome responsibility being carried out (in our name).

*The Attorney General's Ruling(s)*

TDCJ denied plaintiffs' request and sought an opinion from the Attorney General, arguing that information should be withheld on the basis of the "public safety" exception to TPIA. The Attorney General eventually issued a letter to TDCJ stating that some of the information must be released, while some information (the identity of the supplier or manufacturer of lethal injection drugs) could be withheld under the "public safety" exception. Interestingly, this was not the first time the AG's Office ruled on this issue and this ruling was a bit of an about-face.

Before "our" request in 2014, the Attorney General's Office has, at least twice, ruled that the identity of the supplier of LIDs is open and core public information under TPIA.

In 2010, in a decision involving four requests nearly identical to plaintiffs', the Attorney General ruled that TDCJ was required to disclose the information requested. *See* OR2010-17507 (attached in **Appendix 3**).[2] Specifically, the Attorney General determined that TEX. GOV'T CODE §552.022(a)(3) mandated the release of this information as core public information dealing with public contracts and expenditures. Moreover, the Attorney General determined there was no exemption from disclosure because none of the information that TDCJ sought to withhold pertained to an employee or officer of TDCJ.[3]

In 2012, TDCJ once again sought an opinion from the Attorney General, asserting that information about the Department's execution protocol and LIDs

[2] In a previous decision, in 2008, with less factual basis or record, the Attorney General determined that information regarding the names of companies that provide TDCJ's chemicals used during executions could be withheld under the "special circumstances" doctrine. However, the Attorney General's subsequent letter rulings have rejected TDCJ's efforts to shield the requested information on the basis of the same arguments.

[3] Nonetheless, TDCJ continued to refuse to supply the requested information. On December 29, 2010, the requestor filed a Petition for Writ of Mandamus to compel compliance with the Attorney General's Order. On January 10, 2011, after hearing argument, the 261st Judicial District Court, Travis County, issued an Order granting Broden's Petition, and ordering TDCJ to disclose the requested information. *See Broden v. TDCJ*, No. D-1-GN-10-004493 (Jan. 10, 2011).). *See* **Appendix 3**.

3

was exempt from disclosure. The Attorney General once again rejected that assertion in Open Records Letter No. OR2012-10208; CR@43-47. **Appendix 3**.

This 2012 decision is especially significant because TDCJ's argument for secrecy was rejected, even under the new "**substantial threat of physical harm**" exemption articulated by the Texas Supreme Court in *Texas Department of Public Safety v. Cox Newspapers, L.P.*, 343 S.W.3d 112 (Tex. 2011). In OR2012-10208 the Attorney General found that disclosure of this core public information could not be withheld by claiming that there was a "**substantial threat of physical harm**," under *Cox*. The AG ruled that TDCJ could not establish that "disclosure of the information at issue would create a **substantial threat of physical harm** to any individual." That AG Opinion also rejected TDCJ's claim that the information should be secret under the "law-enforcement" exception. The AG held that TDCJ's argument that disclosure would disrupt the operations of the suppliers or otherwise interfere with law enforcement was "too speculative."

The fact that the AG's Office, in 2014, "pulled a 180" is important to this appeal for two main factual reasons. *First,* the record in our case shows (because the identity of the supplier has always been open until now) that there has never been any violence, threat or physical harm against any supplier of LIDs in Texas (or the US, or the world, for that matter). CR@626-27; 636, ¶26. *Second*, the

4

record shows that the AG's office flipped its decision based upon a letter from TDCJ and DPS, and with little new information. CR@550-54.

*TDCJ's Previous Supplier: The Woodlands Compounding Pharmacy*

Since Texas and many other states have made the identity of its LID suppliers known, there is much information in the record demonstrating that TDCJ's alleged claim of imminent violence is far-fetched: There is evidence in the record that pertains to the previous supplier of pentobarbital to TDCJ: The Woodlands Pharmacy. Because LID supplier information has been public in Texas, in or about October 2013, TDCJ disclosed that its supplier of pentobarbital was The Woodlands Compounding Pharmacy ("Woodlands"). According to The Woodlands Pharmacy, it had been promised by TDCJ that it would supply LIDs only if its identity were kept "on the down low" (yes, that is the pharmacy's actual wording). CR@1098. Once its identity became public, The Woodlands Pharmacy decided that it did not want to supply these drugs anymore to TDCJ. CR@17.

What is critical for our appeal (as this is the only empirical evidence in our record) is **why** the Woodlands decided it wanted to discontinue supplying: The Woodlands wrote to TDCJ that its decision had nothing to do with any threat or violence, but rather because it was getting criticized by its customers on its website and feared that its business would decline. CR@1097-98. Our record shows that some customers and community members wrote negative Google reviews of the

5

Woodlands Pharmacy on the pharmacy's website. A number of commenters voiced their opinion that such commerce was contrary to a pharmacist's pledge to save lives and preserve health. CR@1295-304. In addition to the risk of public opprobrium, the Woodlands said it was also withdrawing because it did not want to be part of a lawsuit over the use of its drugs by TDCJ. CR@1098. Again, the letter from the owner of the Woodlands to TDCJ never mentioned violence or threats of violence against him, his business or his employees.[4]

Again, in terms of the only empirical evidence in our record, there is no evidence that once the Woodlands' identity became public that there was ever any physical harm or any risk of physical harm (substantial or otherwise) against the pharmacy (or any previous supplier, for that matter), even though its address and the identities of its owner and employees were publicly accessible via internet searches. There is also no evidence in the record that any violence or threats occurred during an October 9, 2013, vigil.

***The procedural posture of this case and the summary judgment proof***

This appeal is before this Court based upon the parties cross-motions for summary judgment (the parties agreed that there were no contested fact issues and

---

[4] A peaceful protest did occur outside the Woodlands Compounding Pharmacy on October 9, 2013. Montgomery County Sheriff's Officers were sent to observe the protest. Four officers were initially dispatched. One officer left the scene one minute after arriving. The demonstration at Woodlands ended after forty-five minutes. CR@1110, 1112.

that the merits of this case could be decided by summary judgment). Although this case previously passed through this Court when plaintiffs obtained a Temporary Restraining Order, those issues were resolved (as moot) by the Texas Supreme Court after the death-row inmates had exhausted their finals stays and were executed.

As the Court can see from TDCJ's briefing, the summary judgment proof (submitted by both sides) involves three key events that TDCJ bases its argument that the information about a supplier will now create a substantial threat of physical harm:

1) The comments made on the Woodlands Pharmacy website
2) The clip-art used on a French internet site about capital punishment; and
3) A Retired College Professor's E-mail to a pharmacy in Oklahoma that reportedly supplied LIDs to the state of Missouri.

Each side called an outside expert to opine on these three events: Plaintiffs retained and submitted summary judgment proof in the form of an affidavit and deposition testimony from a retired FBI agent with over twenty years' experience and who now provides private consulting services involving corporate security; and defendants retained a former secret service agent who now provides private consulting services involving corporate security. Although the differences in their opinions and testimony will be fleshed out in the argument section of this brief, a few words about the facts involving plaintiffs' retained expert, Mr. Thomas Parker, are in order.

*Plaintiffs' Expert: Mr. Thomas Parker*

Mr. Parker retired from the Federal Bureau of Investigation in 1994 after 24 years of service in that law enforcement agency. CR@807. As an FBI agent, Mr. Parker was involved and managed "some of the FBI's largest investigations and received in excess of twenty commendations from the FBI Director for valor, investigative achievements, and managerial excellence." *Id*. At the time of his retirement from the FBI, Mr. Parker was the Assistant Special Agent in Charge of the FBI's second largest field office in Los Angeles, California. *Id*. Following his retirement from the FBI, Mr. Parker has spent over 20 years working as an investigator serving a number of corporate and government clients in issues of personal and corporate security, police practices, management and operation of corrections facilities, and others. *Id* at 807-08. Mr. Parker has authored a number of publications and book chapters on law enforcement practices, criminal justice and forensic science. *Id*. at 808.

Both during and after his career as an FBI agent, Mr. Parker has conducted a number of threat assessments to determine the risk of violence in different settings, such as: situations involving hostages, anti-government militants, a suspected satanic child sexual abuse cult, sniper shootings and terrorist attacks. *Id*. at 811-12. He has served as an expert witness in state and federal cases involving law enforcement practices, management of correctional facilities and political asylum

claims involving asylum claimants' fear of persecution in other countries. *Id*. at 813. He has been appointed to two different local government commissions on law enforcement and juvenile justice, serving as the Vice-Chair of one and as the Chairman of the other. *Id*. at 813-14.

In this case, Mr. Parker concluded that, absent further investigation, there was insufficient information to conclude that there was a substantial threat of physical harm if the information was released. CR@804. In addition, he explained why the TDCJ position was nothing but fanciful speculation and a "vague assertion of risk." CR@805.

Mr. Parker's professional opinions, based upon decades of education, training and experience, as well as on threat assessment protocols, is that the documents upon which TDCJ and DPS rely do not contain "any discernible direct threats" or "any readily identifiable targeted threats against any pharmacies or individuals connected to them or to the TDCJ." CR@790, ¶14(A). Mr. Parker concludes that the messages and reviews about the Woodlands Pharmacy amount to "criticisms" of the pharmacy. *Id*. ¶14(C).

With regard to the French blog, Mr. Parker similarly fails to find that any wording "could be loosely interpreted as threatening to the subject pharmacies or to anyone else." *Id*. at 793, ¶16. Specifically with regard to the "exploding head" clip-art, Mr. Parker concluded that it is readily available on the internet and that he

9

is "unable to find any connection between the 'exploding head' art in the article to any of the article's contents nor to any individual or business entity." *Id.* at 792, ¶15.

Mr. Parker's opinion also walks-through the email from the retired college professor to show that this e-mail was sent by someone who has no criminal background, is a retired academic, did not actually make any threats, and was posted by someone who listed his full/real name, e-mail address and telephone number. CR@793-94, ¶¶17-18. Mr. Parker also testified that, contrary to TDCJ's claims, no true "threat assessment" was ever performed by TDCJ. *Id.* at 804. After noting that there was no indication that either TDCJ or DPS conducted any research into the authors of any of the e-mails that TDCJ relies upon, Mr. Parker reported his own research into two of the authors, noting that none has a "readily identifiable criminal record or suspect affiliations with any radical anti-death penalty or terrorist groups." *Id.* at 793, ¶17.

In concluding his report and opinions, Mr. Parker stated that Mr. McCraw did not have sufficient information to perform a proper threat assessment, did not undertake steps to obtain any investigation, and did not follow any protocols prior to issuing his purported threat assessment. *Id.* at 804, ¶¶27(A)-(C). Additionally, Mr. Parker concludes that TDCJ was relying only on "vague assertions of risk" and that no "substantial threat of physical harm" was shown. *Id.* at 805, ¶28.

10

*The 2015 amendment regarding secrecy of LID providers*

After plaintiffs won at the trial court, and while this appeal has been pending, the Texas Legislature enacted S.B. 1697, creating new exception to the Public Information Act (Tex. Gov't Code §552.1081) and making secret the identity of "any person or entity" that provides LIDs to TDCJ. This is a new blanket exemption and now no longer requires a showing of any kind of risk of violence by TDCJ; it simply makes the information "exempted from disclosure" to ensure that suppliers are more willing to provide LIDs to Texas. *Id.* The bill is not retroactive and only governs "a request for information that is received by a governmental body . . . on or after the effective date of this Act [September 1, 2015]." *Id.* Thus, in strict legal terms, this new law does not govern our appeal. On a more practical level, the impact of the new amendment is discussed in §I.E.

## SUMMARY OF ARGUMENT

The Texas Supreme Court has established that certain public information may be kept secret under the Texas Public Information Act, if the government can establish (it bears the burden of proof) that release of the information will cause a "*substantial* threat of physical harm." This burden may not be discharged with "vague assertions of risk" or concerns that do not involve actual violence to persons.

11

Our record shows that there has never been any violence in Texas, any state in the U.S., or anywhere in the world, against a supplier of Lethal Injection Drugs or any actual threat of violence (even when states obtained LIDs from European suppliers). This is particularly so in Texas where the identity of LID suppliers has always been public, as well as in other death penalty states. But, there have been LID suppliers who stopped selling these drugs when their identities were disclosed and who feared public opprobrium or consumer boycotts. TDCJ became concerned about its supply chain when its previous supplier backed out, not because of violence but because of negative reviews on its website (when its identity became known). TDCJ then decided to withhold this (previously determined) public information on the ground that there could be "radical fanatics" (*Appellant's Brief at 41*) in the world who might act violently, sometime in the future.

The key issue in this appeal is whether TDCJ, *on this record*, has discharged its high burden to establish a STPH. The District Court correctly held it did not.

## STANDARD OF REVIEW

Because this is an appeal from cross-motions for summary judgment, the standard of review is *de novo. Bell v. Lee*, 49 S.W.3d 8, 9 (Tex. App.—San

12

Antonio 2001, no pet.) (citing *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548-49 (Tex. 1985)).

Because this is a suit under TPIA, there is a presumption that "public information is available to the public." TEX. GOV'T CODE §552.021.

Under TPIA, "core public information" is "information in an account, voucher, or contract relating to the receipt or expenditure of public or other funds by a governmental body." §552.022(a)(3). Our request plainly falls within this section, unless exempted by some other provision of TPIA. In this case, TDCJ invokes §552.022(b) which allows government agency to withhold information if "the category of information is expressly made confidential under other law." TEX. GOV'T CODE §552.022(b). The "other law" that TDCJ relies upon is the "**substantial threat of physical harm**" exception articulated by the Texas Supreme Court in *Texas Department of Public Safety v. Cox Texas Newspapers, L.P.*, 343 S.W.3d 112, 116 (Tex. 2011) (all emphasis in quotations added, unless otherwise noted). All parties agree that **TDCJ bears the burden of proof** in showing that the public information plaintiffs requested is covered by the "substantial threat of physical harm" exception. *Id.* at 116.

**ARGUMENT & AUTHORITIES**

I)  **THE DISTRICT COURT CORRECTLY DETERMINED THAT TDCJ DID NOT DISCHARGE ITS HIGH BURDEN TO ESTABLISH A SUBSTANTIAL THREAT OF PHYSICAL HARM.**

One benefit of being an intermediate court (or a litigant) is that we are all bound by a specific legal standard and here the Texas Supreme Court intentionally set that burden quite high. As such, this Court (as it well knows) is not simply deciding who it "likes better," but rather is applying a specific legal test.

*A) The Supreme Court Set the Burden for Secrecy Very High.*

*1) What the Standard Is.*

In *Cox* , the Texas Supreme Court held that the common-law right to be free from physical harm may except certain documents from disclosure under TPIA. In *Cox*, two newspapers submitted requests under the Act to the Texas Department of Public Safety ("DPS") for travel vouchers for the governor's security detail. *Cox*, 343 S.W.3d at 113.

In recognizing a "physical harm" exception to TPIA under the common law, the Court recognized a "'very narrow set of situations in which release of the information' would cause someone to face 'an **imminent threat** of physical danger.'" *Id.* at 117-18 (quoting TEX. OP. ATT'Y GEN. ORD1977-0169, at 6). The Court then created the legal standard that governs our appeal: The need for

14

secrecy "must be 'more than a desire for privacy or a generalized fear of harassment or retribution.'" *Id.* Here is the holding:

> disclosure of some of the information in the vouchers may create a **substantial threat of physical harm** because it reveals specific details about the number of officers assigned to protect the governor, their general location in relation to him, and their dates of travel. Indeed, the vouchers divulge the number of officers the DPS deemed necessary for the governor's security, the specific location (hotel and room number) where the officers resided when providing that security, and the identity of each officer the Department assigned to the governor's protection.

*Id.* at 118-19. Furthermore, the Court believed that such information about *past* security arrangements could be used to predict *future* arrangements and to "inflict future harm." *Id.* at 119. The Court also explained "A certain amount of deference must be afforded DPS officers and other law enforcement experts about the probability of harm, although **vague assertions of risk** will not carry the day. But the public's right to "complete information" must yield when disclosure of that information would **substantially threaten physical harm**." *Id.*

All this bold font helps illustrate what the test *is* and what it is *not*. The Supreme Court could not be clearer that the government must show that there disclosure will create a "substantial threat of physical harm" which we shall abbreviate in this brief as "**STPH**."

   *2) What the STPH standard is not.*

15

The Supreme Court's precise formulation of the standard is intentionally high because we are dealing with an exception to core public information. In selecting this precise formulation, it is important to momentarily consider what the standard is *not*. The Supreme Court did *not* select a standard that permits secrecy based upon any of the following:

! A **possible** threat of physical harm
! A **conceivable** threat of physical harm
! Substantial Threat of Public Protest
! Substantial Threat of Opprobrium, Criticism, "Hate-mail," Boycotts, Picketing, etc.
! Substantial Threat of Lost Business
! Sometime, somewhere, in another state or country, possibly much in the future, there could be threats of violence related to the supplier of Lethal Injection Drugs,
! Not even: Substantial Threat of **Property Damage**.

As we discuss below, TDCJ is able to convincingly argue (and so did the legislature in 2015) that information about the supplier of LIDs should be kept confidential, because there may be some protests or public-opposition and that a supplier would be more inclined to keep supplying LIDs if its identity is kept secret. But, that is not what the Supreme Court articulated in *Cox*: There must be an actual, substantial threat of physical harm and not a vague or general impression that the supplier would be better off (from public protest) if its identity was concealed.

There Has No Showing of Violence In Texas or Anywhere, Ever.

Although one would never know it from TDCJ's brief, the record does contain actual information about whether there has ever been a STPH regarding lethal injection drugs, in Texas, in the U.S., or on earth. Our record plainly shows that even TDCJ recognizes that there has never been any violence (or threat of violence) against a LID supplier in Texas, even when that information was known for many years. Livingston Deposition at pp.63, 67, 97; CR @1373-74, 1377-78; 1408. In addition, TDCJ concedes that there has never been any violence against a LID supplier in any state in the US (or the world). CR@2117. That is, of course, the case when at least twelve states make such information open and another nine do not have any specific law making such information secret (out of the approximately 31 states that have the death penalty).

And, as stated above, TDCJ's previous supplier mentioned nothing about violence and only stated that it no longer wished to sell to TDCJ because it was concerned about bad press and publicity. *See* Livingston Depo. at 30*;* CR@1341. Similarly, no other previous supplier of the LIDs has expressed concern over violence or their physical safety. Livingston Depo. at 97; CR@1408.

This is critical because, in *Cox*, the Supreme Court specifically ruled that the STPH must be based upon some past conduct that legitimately leads to the conclusion of an actual substantial threat of actual physical harm. Here, there is no proof oy any actual past violence or even threat of violence. In *Cox,* the state had

17

detailed evidence about assassinations of public officials and specific plots to hurt the governor and how the travel information would further those kinds of plots. In fact, plaintiffs have put all of the *Cox* summary judgment record in the record in our case, so the Court can see how much more detailed the summary judgment proof was in *Cox* to establish a STPH. CR@1979-2039.

### B) *None of the Three Items That TDCJ Relies Upon Establishes a STPH.*

TDCJ, aside from its vague assertions that the world is a scary place, has only three actual events upon which it bases its "conclusion" that releasing the information about a supplier will now create a STPH (where none existed in the past):

1) Comments made on The Woodlands Pharmacy website (collected in **Appendix 4**)
2) A French internet site about capital punishment (**Appendix 5**); and
3) A retired college professor's e-mail to a pharmacy in <u>Oklahoma</u> that supplied LIDs to the state of <u>Missouri</u> (**Appendix 6**).

Each will be discussed in turn.

### 1) *The comments to the Woodlands Pharmacy website are simply people expressing their opinions on the death penalty and cannot be used to create a STPH.*

The comments that customers, or others, posted on the Woodlands Pharmacy website prove that there is no STPH, as they are simply people espousing their opinions on the death penalty (or their dislike of the notion that a pharmacist would supply those drugs only when he is promised anonymity).

18

**Appendix 4**.  Although TDCJ (via its Director, Mr. Livingson) claimed that these show something sinister, both DPS and TDCJ's own expert (Cunningham) establish that these are simply people expressing their views on the internet without any threat of violence.  DPS Director Mr. McCraw acknowledged that he "[did]n't see much into" those comments, that he "didn't see anything that – this doesn't bother [him]," and that it was "just one of many people that are complaining." Deposition of S. McCraw at 37:14-38:5; CR@1245-46.  Mr. McCraw confirmed that nothing in the customer emails and Google Reviews of the Woodlands Compounding Pharmacy was of concern to him, and that they "are just – all this does is – individuals weren't happy with – I didn't see any specific threats in there" and that the authors "have a right to express their opinions." *Id*. at 39:11-24; CR@1247.

Even TDCJ's ultra-vigilant/paranoid "expert," Mr. Cunningham (more on him later) conceded that the emails and Google Reviews of the Woodlands Compounding Pharmacy did not suggest that violence was likely: Mr. Cunningham conceded that a small pharmacy could conclude, on the basis of those messages, that it would not provide lethal injection drugs to TDCJ to avoid garden-variety

19

inconvenience.[5] Deposition of L. Cunningham at 168:14-170:14; CR@1627-29. Finally, Mr. Livingston agreed that the communication from the Woodlands Compounding Pharmacy owner to TDCJ did not mention violence or concerns for physical safety, when it decided to stop selling LIDs to TDCJ. Deposition of B. Livingston at 30:10-25; 66:24-67:15; CR@1341; 1377-78.[6] TDCJ's experts admitted that a key concern was that "compounding pharmacies typically stop producing execution drugs after being publicly identified as a supplier." *Appellant's Brief at 46.*

### 2) *The clip art on a website from France cannot be used to create a STPH.*

The second thing that TDCJ tries to seize-upon is a website maintained by a lady in France who is opposed to capital punishment and wrote a blog post about, in her opinion, the hypocrisy of a pharmacist only agreeing to supply LIDs if he was promised anonymity. The blog is called *"The Pentobarbital Experiment"* and is operated by Ms. Sandrine Ageorges-Skinner, a death penalty opponent living in France. On October 6, 2013, following the disclosure that the Woodlands Pharmacy was going to stop selling LIDs once its identity was disclosed, Ms.

---

[5] Mr. Cunningham conceded that on their face, no messages that the Woodlands Compounding Pharmacy received were threats. Deposition of L. Cunningham at 136:11-137:5; 190:18-192:13; CR@1595-96; 1649-51.

[6] Please also keep in mind that TDCJ and the Montgomery County Sheriff's Office spent time monitoring the pharmacy and a protest outside it and reported no violence or risk of violence. CR@1110 & 1112.

20

Ageorges-Skinner published a blog entry taking issue with the Woodlands' decision. The blog criticized Woodlands as "[t]he Pharmacist who approves the business of killing, but only under the veil of secrecy."

Again, all of the experts involved in this case agree that as far as **the text** of the blog goes, there is nothing violent or even suggestive of violence (just someone spouting off about an important public issue that they feel passionately about).

So, if it is not the *words*, then what does TDCJ seize upon? The blog contains a clip-art picture of a sculpture (or possibly a cartoon of a sculpture) of a torso with its hands raised toward its head. The head and one hand are depicted as shattering to pieces. The blog's author obtained the image for use on the blog via an internet search.  In the blog post, the author calls readers to take action in the following ways: writing a negative review for Woodlands on its Google page, complain to the American Pharmacist Association about LIDs, or signing a petition. The blog does not mention violence or threats.

So, no one claims that the text or post is any way objectionable, or that it contains any objectionable comments. But, TDCJ claims that the selection of the clip art (from the trove of images available on google images) establishes a substantial likelihood that violence will actually occur. Even though DPS Director McCraw considered the text harmless, TDCJ claims that the image on the blog can be interpreted (by it) only as represent violence and a call for explosions.

Deposition of S. McCraw at 37:23-38:5; CR@1245-46; Deposition of B. Livingston at 73:14-74:14; CR@1384-85.

There are two quick ways (not counting common sense) to demonstrate that this clip art does not rise to the level of anything, much less a finding of a **substantial** threat of physical harm.

*First*, if this selection of clip art truly made anyone think that violence was likely, then you would think that someone would have investigated the author or the website. But, of course, no one did. TDCJ and Col. McCraw simply decided that they could use this clip art to stake their claim that violence is likely. But, there is no evidence in the record that TDCJ, its agents, its experts or any state or law enforcement or intelligence agency ever tried to contact the blog's author. That is something that you would think someone would do if they truly believed that this author or website was likely to lead to violence.

But, that is not to say it wasn't done *by someone*. The *plaintiffs' expert* (former FBI agent and expert on terrorism and violent crimes, Mr. Thomas Parker) did look into this website and author and established that "the simplest commercial database investigation" shows that the author of the *Pentobarbital Experiment* blog did not have any affiliations with radical groups and has no criminal record (not to mention, lives in France). CR@792, ¶15; CR@793, ¶17.

*Second*, the person who was the most concerned about this image was TDCJ's hired expert, Mr. Cunningham. If the Court can remember how Sergeant Joe Friday on the 1960's TV show, *Dragnet*, used to feel about hippies, long hair or anyone who wore sandals, then that is about how Mr. Cunningham feels about hippies, long hair or anyone who wants to protest anything.

What does TDCJ and its expert find objectionable? To TDCJ, almost any image would support his claim of a STPH: Mr. Livingston testified that a number of other images would have given him the same concern, including a picture of the Woodlands Compounding Pharmacy, a picture of a death-row inmate strapped to a gurney, and even a poison symbol (skull-and-crossbones image). Deposition of B. Livingston at 76:21-77:16*;* CR@1387-88.

TDCJ's hired expert opined that almost any symbol would have a sinister connotation: Mr. Cunningham would also have considered a poison or pirate (skull-and-crossbones) illustration as evidence of a substantial likelihood of physical harm. To further show how "out there" his opinion is, and how it proves too much (or sees violence with every hippie or sandal), Mr. Cunningham testified that if this blog came from an entity named "TorchStone Solutions" (the name of the entity for which Mr. Cunningham works), instead of *The Pentobarbital Experiment*, he would also find *that* sinister, because of the connotation of fire and arson. Deposition of L. Cunningham at 195*;* CR@1654.

23

*3) A Retired College Professor in <u>Ohio</u>'s e-mail to an <u>Oklahoma</u> Pharmacy that Once Provided LIDs to <u>Missouri</u> Does Not Create STPH.*

The only other actual piece of evidence that TDCJ relies upon is an e-mail that "took place" far away from Texas and, in no way, involves Texas (and does not involve violence, either). **Appendix 6**. Once we discuss this third and final piece of "hard evidence" we are done with any fact or event that supports TDCJ's allegation of STPH.

In January 2014 (in a news story that has nothing to do with Texas), the media reported that a pharmacy in Oklahoma (Tulsa Apothecary Shoppe) was selling pentobarbital to the state of Missouri for use in its executions.

So, then, on January 29, 2014, Mr. Nick Humez, a retired college professor, writer and artist (we do not know if he wears sandals), sent an email to the Tulsa Apothecary Shoppe, via its website, referencing the media's coverage of the issue. Prof. Humez questioned the morality of providing execution drugs to Missouri. CR@1305. Professor Humez expressed his opinion that the Apothecary could be drawing unwanted attention, including that of a hypothetical "fanatic with a truckload of fertilizer." Prof. Humez included his real name, telephone number and personal email address in his e-mail to the Apothecary. CR@1305. His e-mail does not threaten any violence by him, nor did he say that he was aware of anyone with an intention or a plan to do so.

24

Of course, as stated above, no act of violence was ever committed against the Tulsa Apothecary Shoppe, or any LID supplier, in Oklahoma, Texas, or anywhere. Nor have any protests against such suppliers ever turned violent or led to any arrests (none shown in our record).

But, to TDCJ, this e-mail is "proof" that actual violence is imminent because of the professor's hyperbolic words. But, again, if this were such a credible threat: why did the writer give his correct name, address and phone number? And, if it was serious, why did no one actually investigate this guy until he became an issue in this suit? Of course, as our expert testified, the fact that this guy used his real name-email-phone, made it even more "unlikely that he intended to commit any violence himself." Parker Aff @ 9, ¶17; CR@793.

Our record shows that no state or federal law enforcement or intelligence entity investigated Prof. Humez or his e-mail until over two months later. On April 8, 2014 (*i.e.*, *weeks after* Appellees submitted its Public Information Act request to TDCJ), two FBI agents came to interview Prof. Humez in response to a request by the Attorney General of Oklahoma and then left him alone. There is no evidence in the record that suggests that the FBI interviewed Prof. Humez more than once, arrested him or considered him a risk. Neither TDCJ nor any Texas law enforcement or intelligence agency appears to have ever contacted Professor Humez in forming its opinion that he was a real risk.

25

One reason no one from Texas may have contacted him was because Mr. McCraw admitted that he did not view the e-mail to Apothecary Tulsa as a "terrorist threat." Deposition of S. McCraw at 44:9-45:6; CR@1252-53.[7] DPS' McCraw also testified that Humez's e-mail message could simply be someone "blowing off steam." *Id.* at 51:21-25; CR@1259.

### C) *TDCJ's experts offer nothing beyond their "spin" on the three documents and thus do not create a STPH.*

Both sides can agree on two things: (1) There has never been any kind of violence, in any state, regarding LIDs or their suppliers (or any protest that had the potential of turning violent); and (2) The universe of data points upon which a credible STPH can be constructed rest solely on the three documents introduced into evidence (Woodlands Pharmacy e-mails; Pentobarbital website; Prof. Humez e-mail).

But, since that evidence is so anemic, TDCJ has tried to dress up their opinion by the testimony of two persons its presents as experts (DPS Director McCraw and its retired secret service agent, Mr. Lawrence Cunningham) to horror-show these documents for us. Director McCraw and TDCJ's paid expert submitted testimony that while these documents may not seem like much, we should "trust

---

[7] In fact, Mr. McCraw stated that none of the materials he received from Mr. Livingston and reviewed fit under the description of a terrorism threat. Deposition of S. McCraw at 44:23-45:6; CR @1252-53.

them" because they are experts. To each of these experts, they know more about how scary the world is and we just need to shut up and trust them to know better.[8]

There are three main reasons why these expert opinions are not sufficient to create a true substantial threat of physical harm based upon the actual evidence before them. We discuss each in turn.

### 1) TDCJ's Witnesses Do Not Permit a Finding of a "Substantial Threat of Physical Harm"

As this Court knows, when we are dealing with expert witnesses, we begin with the six non-exclusive factors to analyze the value of such testimony:

(1) the extent to which the theory has been or can be tested;
(2) the extent to which the technique relies upon the subjective interpretation of the expert;
(3) whether the theory has been subjected to peer review and/or publication;
(4) the technique's potential rate of error;
(5) whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and
(6) the non-judicial uses which have been made of the theory or technique.

*E.I. DuPont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 557 (Tex. 1995). Since, in this case, we are *not* dealing with experts offering scientific or mathematical testimony that is objective or can be tested, the Courts have recognized that there are several pitfalls when considering such subjective

---

[8] Of course, the entire history of censorship (from the banning of James Joyce's *Ulysses* to pamphlets protesting World War I) is all based upon the idea that some "expert" believes that the public would make bad decisions if given information and that we should "trust them" because they know better.

opinions. As Justice Harvey Brown (and Melissa Davis) put it in their recent and exhaustive commentary on the state of expert-witness review by appellate courts, the following flaws render an expert's testimony inadmissible or unreliable:

> The Texas Supreme Court treats expert testimony as conclusory or speculative, such that no objection is necessary to preserve error, when **(1)** the expert fails to provide any explanation or predicate for her opinion; **(2)** the explanation the expert provides for her opinion suffers from too great an "analytical gap"; **(3)** the explanation is predicated on facts, data, or assumptions that do not actually support the expert's explanation or that are not supported by the evidence; **(4)** the expert's explanation is at such a general level that it offers no meaningful information to the jury to enable it to review the reliability of the opinion; and (5) in the context of causation opinions, the expert fails to rule out other plausible causes or explain why the theory of causation adopted by the expert is superior to other plausible theories of causation.

Harvey Brown & Melissa Davis, *Eight Gates for Expert Witnesses: Fifteen Years Later*, 52 HOUS. L. REV. 1, 67-68 (2014). In this case, the first four factors are especially important.

In the words of the Texas Supreme Court "conclusory statements made by an expert witness are insufficient to support summary judgment." *Burrow v. Arce*, 997 S.W.2d 229, 235 (Tex. 1999). Expert opinion may not be relied on when it is a subjective opinion, without any basis for testing, and is simply the expert's "conclusion without any explanation" *Arkoma Basin Exploration Co. v. FMF Associates,* 249 S.W.3d 380, 389 (Tex. 2008). To pretend that we know some Latin, expert testimony may not be based upon an *ipse dixit* pronouncement: "he

28

himself said it." As the U.S. Supreme Court has explained, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 157 (1999); *City of San Antonio v. Pollock*, 284 S.W.3d 809, 822-23 (Tex. 2009) (same).

In this case, that is precisely what DPS Director McCraw and Mr. Cunningham are doing: inveighing that their views (for reasons that we discuss below) need to be trusted because they are experts: while they may not be able to show their work or explain their logical leaps their opinion must trump all facts and other opinions.

With all due respect to DPS Director McCraw, he comes to this case in a manner that undermines his allegedly expert, and highly subjective, opinion: He received a phone call from TDCJ Director Livingston asking for a letter to submit to the court stating that the name of the LID supplier should not be revealed and he readily complied. Here's how that all went down:

In early March 2014, knowing that its supply of pentobarbital was about to dry up because The Woodlands would not provide additional drugs, TDCJ's Director (Mr. Brad Livingston) called DPS Director McCraw. In order to justify the withholding of the name and location of the supplier of Defendant's lethal injection drugs, Mr. Livingston requested a letter to support their non-disclosure so

29

TDCJ could purchase more LIDs. In a sense, it was like asking for a blurb for the dust-jacket of your book from a friend ("Can you please say this is 'the must-read book of the summer?' Thanks, man"). Exhibit 9 to B. Livingston's Deposition at 1; CR@1455.

Mr. McCraw's letter, dated March 7, 2014, reviewed the same three documents we have been discussing (Woodlands e-mails, Pentobarbital Website, and Humez e-mail). Director McGraw is candid that he reviewed no other documents or evidence in forming his opinion. And, so, to help out the prison system he wrote a letter concluding that "some of the threats made to the Woodlands Compounding Pharmacy that we identified **should be taken seriously** . . . ." Exhibit 2 to S. McCraw's Deposition; CR@1291. This last phrase is telling because it says so little: One would expect that law enforcement would think that any bit of information "should be taken seriously." But, whether that means it is an actual threat, of course, is another matter.[9]

By way of corroboration, TDCJ's Livingston testified that he is not aware of additional documents that support the argument that making the name of the lethal

---

[9] By way of example, our record shows the (true) example of the Secret Service discovering a Facebook message, shortly after Osama Bin Laden was killed, saying something like "I hope President Obama has beefed up security so he can be protected if anyone comes after him." CR@2066; Depo. of B. Livingston at 88:24-91:12; CR@1399-402-. That is a piece of intelligence that "should be taken seriously," of course. It turns out that was a post from a middle-school child who was expressing his concern that no one try and hurt President Obama. It was a message that, with some minimal investigation, was not a STPH.

injection drug public could lead to a substantial risk of violence. Deposition of B. Livingston at 59:13-20; CR@1370.

### 2) *A Threat Assessment is an Actual Thing, Not an Opinion*

For all the bantering-about of the phrase "threat assessment," the record shows that this is an actual thing and something that was *never done* by either of TDCJ's experts. To analyze this, we must first begin with what a *"threat assessment"* is in law enforcement parlance. And for that we need expert testimony of plaintiffs' expert, retired FBI Special Agent and security consultant, Mr. Thomas Parker.

A quick word on who this guy is: Mr. Parker retired from the Federal Bureau of Investigation in 1994 after 24 years of service in that law enforcement agency. CR@807. As an FBI agent, Mr. Parker was involved and managed "some of the FBI's largest investigations and received in excess of twenty commendations from the FBI Director for valor, investigative achievements, and managerial excellence." *Id*. At the time of his retirement from the FBI, Mr. Parker was the Assistant Special Agent in Charge of the FBI's second largest field office in Los Angeles, California. *Id*. Following his retirement from the FBI, Mr. Parker has spent over twenty years working as an investigator serving a number of corporate and government clients in issues of personal and corporate security, police practices, management and operation of corrections facilities, and others. *Id*. at

31

807-08. Mr. Parker has authored a number of publications and book chapters on law enforcement practices, criminal justice and forensic science. *Id*. at 808.

Part of Mr. Parker's testimony in this case deals with what a threat assessment is (and is not). On this point, Mr. Parker's qualifications and experience, both during and after his career as an FBI agent, include conducting a number of threat assessments to determine the risk of violence in different settings, such as: situations involving hostages, anti-government militants, a suspected satanic child sexual abuse cult, sniper shootings and terrorist attacks. CR@811-12.

A "threat assessment" is an investigation (meaning an actual field investigation or the use of actual detective work) to determine if a threat made to a person is a viable threat. This means the doing of actual "police work" in determining if a threat ("I hate the Governor") is something that involves an actual risk of violence or harm. How does a law enforcement professional do that? Mr. Parker's testimony is that a threat assessment (as when he performed them for the FBI or when he does so for a corporate client, now) includes investigation into any author(s) of a threat, including the person's identity; location; access and relationship to the target; capabilities; criminal, medical and employment background. Affid. of T. Parker at 18-20, ¶¶B(6)-(C)(4); CR@802. Mr. Parker also believes that the person should be spoken to and/or if done by law enforcement they should also "seriously consider confronting and interviewing the perpetrator."

32

*Id.* at 20, ¶D(9); CR@804. In other words, a threat assessment involves actual police work, which is not anything that DPS, TDCJ, its experts ever did.

What appellant has done is more akin to Johnny Carson's character *The Amazing Karnak.* All TDCJ's experts did was, essentially, hold the three documents up to their foreheads and intuit "Yep, I can tell, this is a real threat." Trust me, I'm an expert.[10]

This is a lot closer to what happened than you would expect. For Director McCraw (whose agency *does* conduct actual threat assessments and which does have the power to collect evidence), none of those things were ever done, even though DPS has a division that performs such assessments routinely. Instead, Director McCraw testified that no such police work was done, short of him sitting in his office thinking about the three documents: Mr. McCraw and DPS did not conduct any investigation nor keep a case file into the identity of the authors of the blog, Google reviews, or emails to pharmacies. Deposition of McCraw at 38:6-20; 39:18-22; 41:15-42:13; CR@1246-47; 1249-50. Neither Mr. McCraw nor Mr. Livingston physically spoke to any supplier of LIDs. *Id.* at 32:15-22; CR@1240; Deposition of B. Livingston at 87:3-7; CR@1398. And Mr. McCraw formed his

---

[10] Mr. Cunningham testified he gets especially concerned about threats made *anonymously*. Deposition of L. Cunningham at 14:9-16:3; CR@1473-75. It is undisputed that most of the communications in this case were *not* anonymous. *See* **Appendix 4-6**.

33

opinion in his office during a couple of hours during a single morning. *Id*. at 11:12-14:23; 16:12-15; 70:16-22; CR@1219-22; 1224; 1278.

The same can be said for Mr. Cunningham who is the first to admit that he does not even consider the three documents to be all that important because his opinion is mostly based upon the idea that "the world is a dangerous place." We will discuss this worldview a little more, later, but I think we can see that such a view is not an expert opinion that can be validated or tested (aside from the fact that there has been no violence involving LIDs in Texas or anywhere) and is little more than "I know better than you."

On the other hand, our expert witness was much more specific. Mr. Parker testified, based upon decades of education, training and experience, as well as on threat assessment protocols, that the documents upon which TDCJ and DPS rely do not contain "any discernible direct threats" or "any readily identifiable targeted threats against any pharmacies or individuals connected to them or to the TDCJ." Parker Aff. at 6, ¶14(A)-(C); CR@790.

With regard to *The Pentobarbital Experiment* blog, Mr. Parker explained that there is no wording that "could be loosely interpreted as threatening to the subject pharmacies or to anyone else." *Id*. at 9, ¶16; CR@793. Specifically with regard to the "exploding head" artwork, Mr. Parker concludes that it is readily available on the internet and Mr. Parker is "unable to find any connection between

34

the 'exploding head' art in the article to any of the article's contents nor to any individual or business entity." *Id.* at 8, ¶15; CR@792.

In formulating his opinion, Mr. Parker also relied on the deposition testimony of TDCJ Director Brad Livingston and DPS Director Steven McCraw. *Id.* at 2-3, ¶¶4(G) & (I); CR@786-87. Among other things, Mr. Parker noted that Mr. Livingston never spoke to previous pharmaceutical suppliers about their decision to cease supplying LIDs. *Id.* at 14, ¶24(B); CR@798. Mr. Parker also noted that Mr. Livingston was not aware of the owner of the Woodlands Compounding Pharmacy reporting any fear of violence. *Id.* at 14, ¶24(C); CR@798. With regard to Mr. McCraw's testimony, Mr. Parker highlighted that Mr. McCraw was unaware of any threats or issues surrounding pharmacies that provided lethal injection drugs, or of any DPS investigations into those issues. *Id.* at 16-17, ¶25(C), (D); CR@800-01.

In concluding his report and opinions, Mr. Parker stated that a true "threat assessment" was not performed. *Id.* at 20, ¶¶27(A)-(C); CR@804. Additionally, Mr. McCraw did not undertake steps to garner additional information, and did not follow any protocols prior to issuing his purported threat assessment. *Id.*[11]

---

[11] Mr. Cunningham acknowledged that where a threat is conveyed via letter or email, one would want to track down who sent the communication, what the author represents, and what is written in the document. Furthermore, one would want to talk to the author. Deposition of L. Cunningham at 14:9-15:3; 17:2-18:2; CR@1473-74; 1476-

Additionally, Mr. Parker concludes that TDCJ attempts to rely on "**vague assertions of risk**" and that no "substantial threat of physical harm" from disclosing the identity of TDCJ's lethal injection drug supplier can be shown. *Id*. at 21, ¶28; CR@805. Again, the key issue in this appeal is not whether some other experts, at some time, could find a STPH, but rather whether TDCJ discharged its high burden, on *this* record.

### 3) Giving up the ghost: TDCJ's expert admits that his opinion does not really involve any of the documents in the record.

TDCJ's outside expert, Mr. Cunningham, admitted that his opinion (that there is a substantial risk of physical harm) really has little to do with the documents we have been examining. To Mr. Cunningham, his opinion is founded upon his belief that the world is a dangerous place and that people can get violent.

Mr. Cunningham admitted his opinion was based upon logical leaps as:

- The Catholic church opposes the death penalty and that there can be religious extremists in the world; CR@618; 622;

---

77. Mr. Cunningham testified that he himself does that in his work for his clients and that he sees the failure to do this as a deficiency in how security is dealt with in our country at present. *Id*. at 31:4-33:6; CR@1490-92. When presented with hypothetical threats to President Obama and to Apple Store employees (taken from real life), Mr. Cunningham testified that an early step in investigating the threats would be to research and interview the authors of the threat. *Id*. at 206:20-209:11; 210:21-212:15; CR@1665-68; 1669-1671. As previously explained, Mr. McCraw, Mr. Livingston and TDCJTDJC did not conduct *any* investigation or interview of the individuals who authored communications to Woodlands, the Apothecary or the blog.

36

- In Lubbock, one doctor was arrested for hiring a hit-man to murder his wife's lover (another doctor): This proves that issues relating to medicine can get violent. CR@621.

Mr. Cunningham offers us the ultimate *ipse dixit*: Trust me, I am an expert and I know that the world would be better off if this information is not disclosed. Of course, how that jibes with the fact that no protest involving LIDs has ever been violent or there has ever been any risk of violence in all of the states and use LIDs is never addressed. Other than, of course, you need to be afraid and you should trust my warnings. TDCJ's experts thus want to discuss things such as the Unabomber, the Olympic bombing in Atlanta in 1996, Al Qaeda, and ISIS. CR@1277; 1501-02. TDCJ's summary judgment proof offers so many hackneyed catch phrases ("proactive," "zero tolerance") and bogey men that we offer the following Bingo card to keep track:



**TDCJ Pro-Active Trust-Me Bingo**

Trust me: Almost all of the bogey man and catch phrases identified above are in TDCJ's summary judgment proof. On appeal, TDCJ has happened upon a new catch phrase, "Firestorm," which appears in its brief fifteen separate times. As we all know, that expression denotes something that does not involve violence (or fire or rain) (or lonely times that you think will never end), as in "a political firestorm" or "a raging controversy" ("His proposal set off a political *firestorm*"). MERRIAM-WEBSTER DICTIONARY (online ed.): http://www.merriam-webster.com/dictionary/firestorm (Last visited 8/8/15).

TDCJ can claim, all it wants, that capital punishment, or the withdrawal of an LID supplier, can ignite a firestorm of controversy, but that has nothing to do with establishing any kind of actual violence.[12]  It is especially intriguing for TDCJ to try and play up the word "firestorm" because no one (not any of its officers, or DPS' or its expert) ever contacted The Woodlands to inquire if it had ever received any kind of actual threat of violence or ever feared for its safety: Certainly that is something that one would expect someone to do if it had any real concerns of this firestorm being anything other than metaphorical, political or imaginary.

With this in mind, let's get back to the real basis of Mr. Cunningham's opinion is that the identity of the LID would probably lead to violence just by his knowledge of the world and the nature of evil-doers.  TDCJ (almost) admits as much in its brief when it argues that it should still "win" even if "these e-mails themselves [do not] constitute actual explicit threats of violence" because such violence "is not the only consideration."  Appellant's Brief at 34.  But, that is the very type of "vague assertion of risk" that the Texas Supreme Court stated could not be relied upon. As stated above, we have the entire summary judgment record and affidavits from the *Cox* case (the request for the Governor's Protective Details travel records) which show a much more fact-intensive analysis than in our case.

_____

[12]   *See, e.g.,* the following headline "JUSTIN BIEBER CAUSES FIRESTORM AFTER SUGGESTING THAT ANNE FRANK WOULD BE A 'BELIEBER.'" http://www.worldwideweirdnews.com/2013/04/26676.html (last visited: 8/8/15) )

39

As further proof of how far "out there" Mr. Cunningham's opinion is, he testified that he knows Mr. McCraw's assessment was reliable because he knew it was conducted by McCraw *and other DPS personnel*. Deposition of L. Cunningham at 232:23-238:24; CR@1691-97. In other words, Mr. Cunningham testified that he learned from Mr. McCraw's deposition that *people other than Mr. McCraw* were involved in the threat assessment. *Id*. at 236:12-238:24; 241:2-14; CR@1691-97; 1700. In point of fact, Mr. McCraw testified that *no other DPS staff* had input on his letter nor has DPS opened any case files or investigations. Deposition of S. McCraw at 19:2-6; 34:13-35:1; 38:12-14; 41:15-42:13; CR@1227; 1242-43; 1246; 1249-50.

TDCJ wishes to argue that it can withhold this information without a "threat of violence" because a specific threat is not "needed to establish that disclosure would substantially threaten physical harm." Appellant's Brief at 49. Although such a threat does seem to be at the heart of the Supreme Court's test, what is plain is that simply "declaring" a threat because of "radical elements" in the world (and with no specific threats or events related to this information) is way beyond what may be relied upon to justify a STPH.

### *4) Plaintiffs' expert provided actual content and context for his opinion.*

By contrast, the Appellees' expert, Mr. Tom Parker, after thoroughly analyzing the same documentary evidence considered by Mr. Livingston and Mr.

McCraw (and, later, by Mr. Cunningham) concludes that the information does not support the conclusion that there is a STPH from disclosure of public information.

Mr. Parker's affidavit thoroughly analyzes the Google business reviews and internet postings written following the disclosure of the identity of the Woodlands Compounding Pharmacy. Mr. Parker reviewed the Pentobarbital Experiment blog entry. Looking at the language of all of these materials, Mr. Parker concludes that no desire to inflict violence or any type of discernible threat can be evinced from the documents. Mr. Parker additionally considered the significance of the blog's cartoon of an "exploding head," and found that the image bore no connection to anything in the article or to any person or entity. Finally, Mr. Parker discusses the email by Prof. Humez to the Apothecary, and notes that Prof. Humez's disclosure of his own name, email address and telephone number made it "unlikely that he intended to commit any violence himself." Parker Aff @ 9, ¶17; CR@793.

Unlike TDCJ's experts, Mr. Parker did not stop at the four corners of the three documents. By conducting research, Mr. Parker was able to determine Prof. Humez's age, domicile, his former profession, his neighborhood, and the absence of any "readily identifiable criminal record or suspect affiliations with any radical anti-death penalty or terrorist groups identifiable on standard internet and commercial databases." Parker Aff. @ 9, ¶17; CR@793. Likewise, "the simplest commercial database investigation" by Mr. Parker showed that the author of the

41

*Pentobarbital Experiment* blog did not have any affiliations with radical groups and did not have a criminal record. All the experts in this case agree that researching the author of a threat is among the first and most important steps in conducting an investigation. Why Mr. McCraw and Mr. Cunningham could not do that (with the exception of an assistant contacting Prof. Humez) is not explained.

On the basis his review of the documents that TDCJ's experts also reviewed, based on his additional research, as well as on his forty-plus years of background, training and experience, Mr. Parker concluded that DPS did not provide an actual "threat assessment." Neither Mr. McCraw nor Mr. Cunningham followed accepted practices in the literature or conducting such an assessment by, at least, investigating the authors of what he considered threats.

What does TDCJ say about plaintiffs' expert? Well, DPS learned when deposing Mr. Parker that he has donated his time (as a law enforcement investigator) to organizations that investigate the actual innocence of inmates (including those on death row) and has become a member of such pro bono organizations. CR@2250-51. So, to TDCJ, the fact that he is opposed to the death penalty makes his entire opinion discountable (and the fact that Mr. Cunningham believes in the death penalty is irrelevant). But, their views on capital punishment notwithstanding, the issue in this case is whether the actual evidence in this case discharges TDCJ's high burden of establishing a substantial threat of actual,

42

physical violence.  Plainly, as the district court determined, such a high burden has not been met.

### D) A final word about the 2015 legislative change.

In the 2015 legislative session, as a response to this case, TDCJ sought to amend TPIA to make this information secret, without a showing of any risk of violence (S.B.1697).  This bill was passed and effective for any TPIA request made on or after September 1, 2015 (creating new TPIA section, §552.1081). This bill was enacted because TDCJ was concerned that if the identity was continued to be made known, that bad publicity or other public opprobrium would make a providers less willing to supply the drugs to TDCJ and that a shortage could ensue. Plainly, this is something that the legislature is entitled to do.

Both sides agree that this change does not affect our case because the statute is not retroactive.  See Appellant's Brief at 18, 24.  But, this legislative change does affect our case in two ways.

*First,* the change shows that the legislature no longer wanted the secrecy of this information to solely upon a showing that a STPH was present. In other words, the Legislature recognized that even a peaceful act of protest (or even boycott) might affect a pharmacist's decision to supply LIDs.  This change highlights the fact –before the amendment was effective—that TDCJ recognized that such a showing of violence was very difficult and did not wish to be burdened by that

43

standard anymore. Similarly, the change highlights that if *all* we have here is the risk of peaceful, lawful protest by those opposed to capital punishment, that is not sufficient to justify censorship and secrecy before the effective date of S.B. 1697. And that is all this record contains.

*Second*, the amendment also shows how "small" the issue is before this Court. Anyone who supplies LIDs to TDCJ *after* September 1, 2015, is secret under the law, no matter what. Thus, the only issue before this court is the identity of suppliers in April 2014, the date of the plaintiffs' TPIA request. Since the identity of all Texas LID suppliers was known up until that point, and there has never been any actual or threatened violence against any of *those providers*, that confirms that TDCJ has not discharged its high burden to justify secrecy, under the law before the new statute was enacted.

## PRAYER

For the foregoing reasons, Appellees respectfully request that the Court affirm the trial court's judgment which granted Appellees' Motion for Summary Judgment and denied Appellants' Motion for Summary Judgment.

44

Respectfully submitted,

*/s/ Philip Durst*

Philip Durst
State Bar No. 06287850
Manuel Quinto-Pozos
State Bar No. 24070459
DEATS, DURST & OWEN, P.L.L.C.
1204 San Antonio Street, Suite 203
Austin, Texas 78701
(512) 474-6200
Fax: (512) 474-7896

Counsel for Appellees

45

## CERTIFICATE OF COMPLIANCE

As required by Texas Rule of Appellate Procedure 9.4(i)(3), the above-signed counsel for Appellees certifies that the number of words in this document, excluding those properly excluded under TRAP 9.4(i)(1), is 10,440.

## CERTIFICATE OF SERVICE

As required by Texas Rule of Appellate Procedure 6.3 and 9.5, I certify that I have served this document on the below-listed counsel for all other parties on August 10, 2015, by electronic transmission and facsimile:

Richard B. Farrer
Assistant Solicitor General
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711-2548

*/s/ Philip Durst*
Philip Durst/Manuel Quinto-Pozos

# APPENDIX 1

# TRIAL COURT'S ORDER

Filed in The District Court
of Travis County, Texas

DEC 11 2014

At _____2:25_____ p. M.
Amalia Rodriguez-Mendoza, Clerk

CAUSE NO. D-1-GN-14-000908

| | | |
|---|---|---|
| MAURIE LEVIN, NAOMI TERR, and, | § | IN THE DISTRICT COURT OF |
| HILARY SHEARD, | § | |
|     Plaintiffs | § | |
| | § | |
| VS. | § | |
| | § | |
| | § | TRAVIS COUNTY, TEXAS |
| TEXAS DEPARTMENT OF | § | |
| CRIMINAL JUSTICE, | § | |
|     Defendant | § | 201ST JUDICIAL DISTRICT |

## ORDER ON PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT and DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Came on for consideration at a hearing on December 3, 2014, Plaintiffs' Motion for Partial Summary Judgment and Defendant's Motion for Summary Judgment. Plaintiffs and Defendant appeared at the hearing through their respective counsel. After considering the arguments made at the hearing on December 3, 2014, the relevant pleadings on file, the summary judgment evidence tendered to the Court at the time of the hearing, and the Court's separate rulings on Plaintiffs' and Defendant's Objections to and Motions to Strike Summary Judgment Evidence and Defendant's Motion to Strike Plaintiffs' Expert, Thomas Parker, the Court now finds that Plaintiffs' Motion for Partial Summary Judgment should be granted and Defendant's Motion for Summary Judgment should be denied.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the Plaintiffs' Motion for Partial Summary Judgment is GRANTED.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendant's Motion for Summary Judgment is DENIED.

SIGNED on the _11_ day of DECEMBER, 2014,

DARLENE BYRNE
JUDGE PRESIDING

2297

# APPENDIX 2

## TEX. GOV'T CODE CH. 552
### (excerpts)

## SB 1697

SUBCHAPTER B. RIGHT OF ACCESS TO PUBLIC INFORMATION


Sec. 552.021.  AVAILABILITY OF PUBLIC INFORMATION.  Public information is available to the public at a minimum during the normal business hours of the governmental body.
Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.
Amended by Acts 1995, 74th Leg., ch. 1035, Sec. 2, eff. Sept. 1, 1995.


Sec. 552.0215.  RIGHT OF ACCESS TO CERTAIN INFORMATION AFTER 75 YEARS.  (a) Except as provided by Section 552.147, the confidentiality provisions of this chapter, or other law, information that is not confidential but is excepted from required

disclosure under Subchapter C is public information and is available to the public on or after the 75th anniversary of the date the information was originally created or received by the governmental body.

(b) This section does not limit the authority of a governmental body to establish retention periods for records under applicable law.

Added by Acts 2011, 82nd Leg., R.S., Ch. 462 (S.B. 1907), Sec. 1, eff. September 1, 2011.


Sec. 552.022.  CATEGORIES OF PUBLIC INFORMATION; EXAMPLES. (a)  Without limiting the amount or kind of information that is public information under this chapter, the following categories of information are public information and not excepted from required disclosure unless made confidential under this chapter or other law:

(1) a completed report, audit, evaluation, or investigation made of, for, or by a governmental body, except as provided by Section 552.108;

(2) the name, sex, ethnicity, salary, title, and dates of employment of each employee and officer of a governmental body;

(3) information in an account, voucher, or contract relating to the receipt or expenditure of public or other funds by a governmental body;

(4) the name of each official and the final record of voting on all proceedings in a governmental body;

(5) all working papers, research material, and information used to estimate the need for or expenditure of public funds or taxes by a governmental body, on completion of the estimate;

(6) the name, place of business, and the name of the municipality to which local sales and use taxes are credited, if any, for the named person, of a person reporting or paying sales and use taxes under Chapter 151, Tax Code;

(7) a description of an agency's central and field organizations, including:

(A) the established places at which the public

may obtain information, submit information or requests, or obtain decisions;

    (B) the employees from whom the public may obtain information, submit information or requests, or obtain decisions;

    (C) in the case of a uniformed service, the members from whom the public may obtain information, submit information or requests, or obtain decisions; and

    (D) the methods by which the public may obtain information, submit information or requests, or obtain decisions;

   (8) a statement of the general course and method by which an agency's functions are channeled and determined, including the nature and requirements of all formal and informal policies and procedures;

   (9) a rule of procedure, a description of forms available or the places at which forms may be obtained, and instructions relating to the scope and content of all papers, reports, or examinations;

   (10) a substantive rule of general applicability adopted or issued by an agency as authorized by law, and a statement of general policy or interpretation of general applicability formulated and adopted by an agency;

   (11) each amendment, revision, or repeal of information described by Subdivisions (7)-(10);

   (12) final opinions, including concurring and dissenting opinions, and orders issued in the adjudication of cases;

   (13) a policy statement or interpretation that has been adopted or issued by an agency;

   (14) administrative staff manuals and instructions to staff that affect a member of the public;

   (15) information regarded as open to the public under an agency's policies;

   (16) information that is in a bill for attorney's fees and that is not privileged under the attorney-client privilege;

   (17) information that is also contained in a public court record; and

   (18) a settlement agreement to which a governmental

body is a party.

(b)  A court in this state may not order a governmental body or an officer for public information to withhold from public inspection any category of public information described by Subsection (a) or to not produce the category of public information for inspection or duplication, unless the category of information is confidential under this chapter or other law.

Added by Acts 1993, 73rd Leg., ch. 268, Sec. 1, eff. Sept. 1, 1993.

Amended by Acts 1995, 74th Leg., ch. 1035, Sec. 3, eff. Sept. 1, 1995; Acts 1999, 76th Leg., ch. 1319, Sec. 5, eff. Sept. 1, 1999.

Amended by:

Acts 2011, 82nd Leg., R.S., Ch. 1229 (S.B. 602), Sec. 2, eff. September 1, 2011.

AN ACT

relating to the confidentiality of certain information regarding procedures and substances used in the execution of a convict.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF TEXAS:

SECTION 1.  Subchapter C, Chapter 552, Government Code, is amended by adding Section 552.1081 to read as follows:

Sec. 552.1081.  EXCEPTION:  CONFIDENTIALITY OF CERTAIN INFORMATION REGARDING EXECUTION OF CONVICT.  Information is excepted from the requirements of Section 552.021 if it contains identifying information under Article 43.14, Code of Criminal Procedure, including that of:

(1) any person who participates in an execution procedure, including a person who uses, supplies, or administers a substance during the execution; and

(2) any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution.

SECTION 2.  Article 43.14, Code of Criminal Procedure, is amended to read as follows:

Art. 43.14. EXECUTION OF CONVICT: CONFIDENTIAL INFORMATION [CONVICT]. (a) Whenever the sentence of death is pronounced against a convict, the sentence shall be executed at any time after the hour of 6 p.m. on the day set for the execution, by intravenous injection of a substance or substances in a lethal quantity sufficient to cause death and until such convict is dead, such execution procedure to be determined and supervised by the director of the correctional institutions division of the Texas Department of Criminal Justice.

(b) The name, address, and other identifying information of the following is confidential and excepted from disclosure under Section 552.021, Government Code:

(1) any person who participates in an execution procedure described by Subsection (a), including a person who uses, supplies, or administers a substance during the execution; and

(2) any person or entity that manufactures, transports, tests, procures, compounds, prescribes, dispenses, or provides a substance or supplies used in an execution.

SECTION 3. The changes in law made by this Act apply only to a request for information that is received by a governmental body or an officer for public information on or after the

effective date of this Act.  A request for information that was received before the effective date of this Act is governed by the law in effect on the date the request was received, and the former law is continued in effect for that purpose.

SECTION 4. This Act takes effect immediately if it receives a vote of two-thirds of all the members elected to each house, as provided by Section 39, Article III, Texas Constitution.  If this Act does not receive the vote necessary for immediate effect, this Act takes effect September 1, 2015.

_____     _____
President of the Senate              Speaker of the House

    I hereby certify that S.B. No. 1697 passed the Senate on May 11, 2015, by the following vote:  Yeas 23, Nays 8.


                                           _____
                                         Secretary of the Senate

    I hereby certify that S.B. No. 1697 passed the House on May 19, 2015, by the following vote:  Yeas 99, Nays 45, two present not voting.


                                         _____
                                         Chief Clerk of the House


Approved:


_____
               Date


_____
           Governor

# APPENDIX 3

# Attorney General Letters

# *Broden v. TDCJ* order



November 18, 2010

Ms. Patricia Fleming
Assistant General Counsel
TDCJ - Office of the General Counsel
P.O. Box 4004
Huntsville, Texas 77342-4004

OR2010-17507

Dear Ms. Fleming:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 400366.

The Texas Department of Criminal Justice (the "department") received requests from four requestors for information and correspondence regarding the department's suppliers and current stock of lethal injection drugs, including efforts to acquire more or alternative drugs, correspondence with other states or entities regarding those drugs, and correspondence with a named company. You claim the requested information is excepted from disclosure under sections 552.101, 552.108, and 552.151 of the Government Code. We have considered the exceptions you claim and reviewed the submitted information. We have also received and considered comments submitted by three of the requestors and an interested third party. *See* Gov't Code § 552.304 (interested party may submit written comments regarding availability of requested information).

Initially, we note you have not submitted information responsive to the requests for records or correspondence regarding efforts to acquire more of the currently used drugs, records or correspondence regarding efforts to find alternative drugs, correspondence with other states or entities regarding the drugs, or correspondence with the named company. To the extent information responsive to these aspects of the requests existed on the dates the department received the requests, we assume you have released it. If you have not released any such information, you must do so at this time. *See id.* §§ 552.301(a), .302; *see also* Open Records

POST OFFICE BOX 12548, AUSTIN, TEXAS 78711-2548 TEL:(512)463-2100 WWW.OAG.STATE.TX.US
*An Equal Employment Opportunity Employer · Printed on Recycled Paper*

33

Decision No. 664 (2000) (if governmental body concludes that no exceptions apply to requested information, it must release information as soon as possible).

Next, you state the only form of media maintained by the department that contains information regarding the requested lethal injection drug stock quantities and expiration dates are the labels affixed to each vial of drug. You have inquired whether the submitted photographs of drug vial labels are sufficient to be considered responsive to these parts of the requests, or whether the department is required to count, inventory, and reduce to writing the requested information regarding quantities and expiration dates. The Act does not require a governmental body to make available information that did not exist when the request was received, nor does it require a governmental body to compile information or prepare new information. *See Economic Opportunities Dev. Corp. v. Bustamante*, 562 S.W.2d 266 (Tex. Civ. App.—San Antonio 1978, writ dism'd); Open Records Decision No. 452 at 3 (1986). However, a governmental body must make a good-faith effort to relate a request to information that is within its possession or control. *See* Open Records Decision No. 561 at 8-9 (1990). As you have submitted information you deem to be responsive to the requests for quantities and expiration dates, we will address your claimed exceptions for this information, as well as the remaining submitted information.

We note the submitted information contains purchase orders. Section 552.022 of the Government Code provides in pertinent part:

> (a) Without limiting the amount or kind of information that is public information under this chapter, the following categories of information are public information and not excepted from required disclosure under this chapter unless they are expressly confidential under other law:
>
>> (3) information in an account, voucher, or contract relating to the receipt or expenditure of public or other funds by a governmental body[.]

Gov't Code § 552.022(a)(3). The submitted purchase orders are vouchers related to the expenditure of public funds by the department and are, thus, made public under section 552.022(a)(3). Information subject to section 552.022(a)(3) must be released unless it is expressly confidential under other law. You claim the last dates of purchase listed on some of the purchase orders are excepted from disclosure under section 552.108 of the Government Code. This section, however, is a discretionary exception to disclosure that protects a governmental body's interests and may be waived. *See* Open Records Decision Nos. 665 at 2 n.5 (2000) (discretionary exceptions generally), 586 (1991) (governmental body may waive section 552.108). As such, section 552.108 is not other law that makes information confidential for the purposes of section 552.022(a)(3). Therefore, the department may not withhold the last dates of purchase under section 552.108 of the Government Code. You also claim the last dates of purchase are excepted under

sections 552.101 and 552.151 of the Government Code. As these sections are considered other law for purposes of section 552.022(a)(3), we will consider the applicability of sections 552.101 and 552.151 to the submitted last dates of purchase, as well as your arguments against disclosure for the remaining information.

Section 552.101 of the Government Code excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." Gov't Code § 552.101. Section 552.101 encompasses the doctrine of common-law privacy, which protects information if it (1) contains highly intimate or embarrassing facts, the publication of which would be highly objectionable to a reasonable person, and (2) is not of legitimate concern to the public. *Indus. Found. v. Tex. Indus. Accident Bd.*, 540 S.W.2d 668, 685 (Tex. 1976). To demonstrate the applicability of common-law privacy, both prongs of this test must be established. *Id.* at 681-82. You seek to withhold under common-law privacy and "special circumstances" the quantities and expiration dates of the department's lethal injection drug stock, the last dates of purchase of those drugs, and the names of the suppliers from which the department acquires those drugs. However, the Third Court of Appeals ruled the "special circumstances" exception found in past Attorney General Open Records Decisions directly conflicts with Texas Supreme Court precedent regarding common-law privacy. *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P. & Hearst Newspapers, L.L.C.*, 287 S.W. 3d 390 (Tex. App.—Austin 2009, pet. filed). The court of appeals ruled the two-part test set out in *Industrial Foundation* is the "sole criteria" for determining whether information can be withheld under common-law privacy. *Id.*; *see also Indus. Found.*, 540 S.W.2d at 686. In this instance, the information at issue consists of drug quantities, expiration dates, last dates of purchase, and supplier names. You have not explained how this information is highly intimate or embarrassing. As you have failed to demonstrate the information meets the first prong of the *Industrial Foundation* test for privacy, we find the drug quantities, expiration dates, last dates of purchase, and supplier names at issue are not confidential under common-law privacy and the department may not withhold this information under section 552.101 of the Government Code.

Section 552.151 of the Government Code provides:

> Information in the custody of a governmental body that relates to an employee or officer of the governmental body is excepted from the requirements of Section 552.021 if, under the specific circumstances pertaining to the employee or officer, disclosure of the information would subject the employee or officer to a substantial threat of physical harm.

Gov't Code § 552.151. You seek to withhold the requested drug quantities, expiration dates, last dates of purchase, and supplier names under section 552.151. This section, however, applies only to information that relates to an employee or officer of the department. As none of the information you seek to withhold pertains to a department employee or officer, we find you have failed to demonstrate the applicability of section 552.151 to the information at

issue. Consequently, none of the information you seek to withhold may be withheld under section 552.151 of the Government Code.

Section 552.108(b)(1) of the Government Code excepts from disclosure the internal records and notations of law enforcement agencies and prosecutors when their release would interfere with law enforcement and crime prevention. *Id.* § 552.108(b)(1); *see also* Open Records Decision No. 531 at 2 (1989) (quoting *Ex parte Pruitt*, 551 S.W.2d 706 (Tex. 1977)). Section 552.108(b)(1) is intended to protect "information which, if released, would permit private citizens to anticipate weaknesses in a police department, avoid detection, jeopardize officer safety, and generally undermine police efforts to effectuate the laws of this State." *See City of Ft. Worth v. Cornyn*, 86 S.W.3d 320 (Tex. App.—Austin 2002, no writ). To demonstrate the applicability of this exception, a governmental body must meet its burden of explaining how and why release of the requested information would interfere with law enforcement and crime prevention. Open Records Decision No. 562 at 10 (1990). This office has concluded section 552.108(b) excepts from public disclosure information relating to the security or operation of a law enforcement agency. *See, e.g.*, Open Records Decision Nos. 531 (release of detailed use of force guidelines would unduly interfere with law enforcement), 252 (1980) (section 552.108 of the Government Code is designed to protect investigative techniques and procedures used in law enforcement), 143 (1976) (disclosure of specific operations or specialized equipment directly related to investigation or detection of crime may be excepted).

You assert the requested drug quantities and expiration dates are excepted under section 552.108(b)(1). You contend disclosure of this information, when coupled with other publicly known information, would allow death row offenders and the public to determine how much of the lethal injection drugs the department has available for future executions. You argue this knowledge will motivate those offenders and the public to disrupt the offenders' scheduled executions. Although gaining this knowledge may motivate the offenders and/or public to disrupt the executions, you have not explained how disclosure of the requested drug quantities and expiration dates would actually allow or aid the offenders or public to disrupt the execution process or otherwise interfere with law enforcement. Thus, we find you have failed to establish how public access to the information at issue would interfere with law enforcement. Consequently, the department may not withhold the requested drug quantities and expiration dates under section 552.108(b)(1) of the Government Code. As you have not claimed any other exceptions to disclosure, the requested information must be released.

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and

responsibilities, please visit our website at http://www.oag.state.tx.us/open/index_orl.php, or call the Office of the Attorney General's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public information under the Act must be directed to the Cost Rules Administrator of the Office of the Attorney General, toll free, at (888) 672-6787.

Sincerely,

Leah B. Wingerson
Assistant Attorney General
Open Records Division

LBW/dls

Ref: ID# 400366

Enc. Submitted documents

c: Requestor
(w/o enclosures)

Mr. Brian W. Stull
Senior Staff Attorney
ACLU Foundation
201 West Main Street, Suite 402
Durham, North Carolina 27701
(w/o enclosures)

Ms. Lisa Graybill
Legal Director
ACLU of Texas
P.O. Box 12905
Austin, Texas 78711-2905
(w/o enclosures)

Mr. Joshua Houston
Ms. Bee Moorhead
Texas Impact
221 East 9th Street, Suite 403
Austin, Texas 78701
(w/o enclosures)

July 3, 2012

Ms. Patricia Fleming
Assistant General Counsel
Office of the General Counsel
Texas Department of Criminal Justice
P.O. Box 4004
Huntsville, Texas 77342-4004

OR2012-10208

Dear Ms. Fleming:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 457886.

The Texas Department of Criminal Justice (the "department") received a request for twelve categories of information pertaining to the department's execution protocol and the procurement and use of lethal injection drugs. You state some information has been or will be released. You claim the submitted information is excepted from disclosure under sections 552.101 and 552.108 of the Government Code. We have considered the claimed exceptions and reviewed the submitted information.

Initially, we note some of the submitted information was the subject of a previous request for a ruling, in response to which this office issued Open Records Letter No. 2012-08649 (2012). In this prior ruling, we ruled the department must withhold the marked billing account numbers under section 552.136 of the Government Code and must release the remaining information. We have marked the information subject to this prior ruling. As we have no indication there has been any change in the law, facts, or circumstances on which this ruling was based, we conclude the department must rely on Open Records Letter No. 2012-08649 as a previous determination and withhold or release the marked information

43

in accordance with it.[1] *See* Open Records Decision No. 673 (2001) (so long as law, facts, and circumstances on which prior ruling was based have not changed, first type of previous determination exists where requested information is precisely same information as was addressed in prior attorney general ruling, ruling is addressed to same governmental body, and ruling concludes that information is or is not excepted from disclosure). However, we will address your arguments against disclosure of the remaining submitted information.

We note some of the remaining information consists of purchase orders, invoices, and vouchers that are subject to section 552.022(a)(3) of the Government Code. Section 552.022(a)(3) provides "information in an account, voucher, or contract relating to the receipt or expenditure of public or other funds by a governmental body" is subject to required public disclosure unless it is "made confidential under this chapter or other law." Gov't Code § 552.022(a)(3). Although you raise section 552.108 of the Government Code for portions of the information subject to section 552.022(a)(3), section 552.108 is a discretionary exception to disclosure and does not make information confidential under the Act. *See* Open Records Decision Nos. 665 at 2 n.5 (2000) (discretionary exceptions generally), 177 at 3 (1977) (statutory predecessor to section 552.108 subject to waiver). Therefore, the department may not withhold the information subject to section 552.022(a)(3) under section 552.108. However, you also raise section 552.101 of the Government Code for portions of this information, and we note some of the information contains account numbers subject to section 552.136 of the Government Code.[2] Accordingly, because sections 552.101 and 552.136 make information confidential under the Act, we will consider their applicability to the information at issue. We will also consider your arguments under sections 552.101 and 552.108 for the remaining information not subject to section 552.022(a)(3).

Section 552.101 of the Government Code excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." Gov't Code § 552.101. You assert portions of the submitted information are confidential pursuant to the common-law physical safety exception that the Texas Supreme Court recognized in *Texas Department of Public Safety v. Cox Texas Newspapers, L.P. & Hearst Newspapers, L.L.C.,* 343 S.W.3d 112, 117 (Tex. 2011) ("freedom from physical harm is an independent interest protected under law, untethered to the right of privacy"). In the *Cox* decision, the Texas Supreme Court recognized, for the first time, a common-law physical safety exception to required disclosure. *Cox,* 343 S.W.3d at 118. Pursuant to this common-law physical safety exception, the court determined "information may be withheld [from public release]

---

[1] Because our ruling as to this information is dispositive, we do not address your arguments against its disclosure.

[2] The Office of the Attorney General will raise a mandatory exception on behalf of a governmental body, but ordinarily will not raise other exceptions. Open Records Decision Nos. 481 (1987), 480 (1987), 470 (1987).

if disclosure would create a substantial threat of physical harm." *Id.* In applying this new standard, the court noted "deference must be afforded" law enforcement experts regarding the probability of harm, but further cautioned "vague assertions of risk will not carry the day." *Id.* at 119.

You seek to withhold addresses, phone numbers, distributor information, various numeric identifiers, and certain notations and descriptions contained in the information at issue. You assert this information is confidential under the common-law physical safety exception because disclosure of this information will reveal the identities of the department's suppliers and distributors of lethal injection drugs, and as a result, the suppliers and distributors will be subject to potential harassment. You also allege there would be a substantial threat of physical harm to the companies at issue because previously known suppliers have been subject to harassment by certain interest groups in the past, and you believe such harassment could escalate into violence. Upon review, while we acknowledge the department's concerns, we find you have not established disclosure of the information at issue would create a substantial threat of physical harm to any individual. Thus, the department may not withhold any of the submitted information under section 552.101 of the Government Code in conjunction with the common-law physical safety exception.

You assert the remaining information not subject to section 552.022(a)(3) is excepted under section 552.108 of the Government Code. Section 552.108(b)(1) excepts from disclosure "[a]n internal record or notation of a law enforcement agency or prosecutor that is maintained for internal use in matters relating to law enforcement or prosecution . . . if . . . release of the internal record or notation would interfere with law enforcement or prosecution[.]" Gov't Code § 552.108(b)(1). Section 552.108(b)(1) is intended to protect "information which, if released, would permit private citizens to anticipate weaknesses in a police department, avoid detection, jeopardize officer safety, and generally undermine police efforts to effectuate the laws of this State." *City of Fort Worth v. Cornyn*, 86 S.W.3d 320 (Tex. App.—Austin 2002, no pet.). To demonstrate the applicability of this exception, a governmental body must meet its burden of explaining how and why release of the requested information would interfere with law enforcement and crime prevention. Open Records Decision No. 562 at 10 (1990) (construing statutory predecessor). This office has concluded section 552.108(b)(1) excepts from public disclosure information relating to the security or operation of a law enforcement agency. *See, e.g.*, Open Records Decision Nos. 531 (1989) (release of detailed use of force guidelines would unduly interfere with law enforcement), 252 (1980) (section 552.108 designed to protect investigative techniques and procedures used in law enforcement), 143 (1976) (disclosure of specific operations or specialized equipment directly related to investigation or detection of crime may be excepted). Section 552.108(b)(1) is not applicable, however, to generally known policies and procedures. *See, e.g.*, ORDs 531 at 2-3 (Penal Code provisions, common law rules, and constitutional limitations on use of force not protected), 252 at 3 (governmental body failed to indicate why investigative procedures and techniques requested were any different from those commonly known). The determination

of whether the release of particular records would interfere with law enforcement is made on a case-by-case basis. Open Records Decision No. 409 at 2 (1984).

You contend disclosure of some of the remaining information, when coupled with other publicly known information, would allow certain parties to determine which companies supply the department with lethal injection drugs. You argue these parties will attempt to disrupt the operations of the department's suppliers, thus inhibiting the department's ability to obtain such drugs and interfering with the department's statutory duty to carry out the execution process. You argue release of the inventory information would permit certain parties to estimate when the department's stock will be facing depletion or expiration and then harass potential suppliers. Upon review, we find your arguments as to how disclosure of the remaining information would result in the disruption of the execution process or otherwise interfere with law enforcement to be too speculative. *See* Open Records Decision No. 582 (1990) (finding prospects for criminal prosecution too speculative to withhold information under predecessor to section 552.108). Thus, we find you have failed to establish how public access to this information would interfere with law enforcement. Consequently, the department may not withhold any of the remaining information under section 552.108(b)(1) of the Government Code.

Section 552.136 of the Government Code provides that "[n]otwithstanding any other provision of this chapter, a credit card, debit card, charge card, or access device number that is collected, assembled, or maintained by or for a governmental body is confidential." Gov't Code § 552.136(b). An access device number is one that may be used to "(1) obtain money, goods, services, or another thing of value; or (2) initiate a transfer of funds other than a transfer originated solely by paper instrument," and includes an account number. *Id.* § 552.136(a). The department must withhold the billing account numbers we have marked under section 552.136.

In summary, the department must withhold or release the information we have marked subject to Open Records Letter No. 2012-08649 in accordance with that ruling. The department must withhold the billing account numbers we have marked under section 552.136 of the Government Code. The remaining information must be released to the requestor.

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at http://www.oag.state.tx.us/open/index_orl.php, or call the Office of the Attorney General's Open Government Hotline, toll free, at (877) 673-6839. Questions concerning the allowable charges for providing public

information under the Act must be directed to the Cost Rules Administrator of the Office of the Attorney General, toll free at (888) 672-6787.

Sincerely,

*Misty Haberer Barham*

Misty Haberer Barham
Assistant Attorney General
Open Records Division

MHB/som

Ref:     ID# 457886

Enc.    Submitted documents

c:       Requestor
         (w/o enclosures)



County of
TRAVIS
STATE OF TEXAS

# FAX TRANSMISSION COVER PAGE

**DATE:** 1/10/11

**FROM:** Stacey Rosen

259th District Court
Travis County Courthouse
P.O. Box 1748
Austin, Texas 78767
FAX: (512) 854-9332

**SUBJECT:** Cause No. GN-10-004493; Braden v. TDCJ

## PLEASE DELIVER THIS FAX TRANSMISSION TO:

| TO: | | FAX NUMBER: | |
|---|---|---|---|
| TO: | Jack Hohengarten | FAX NUMBER: | 477-2348 |
| TO: | Bryce Benjet | FAX NUMBER: | 494-0022 |
| TO: | Maurie Levin | FAX NUMBER: | 232-9171 |
| TO: | | FAX NUMBER: | |
| TO: | | FAX NUMBER: | |
| TO: | | FAX NUMBER: | |
| TO: | | FAX NUMBER: | |

You are receiving a transmission of (3) pages, including this cover page. If problems occur and you do not receive all pages of this transmission, please call our FAX operator at **(512) 854-9300** for assistance. The FAX machine used by the District Judges' Office is located in our office, however, it is not always staffed. Please telephone the District Judges' Office FAX operator to ensure your transmitted documents are immediately picked up.

If you receive this communication in error or if problems occur and you do not receive all pages of this transmission, please contact the DISTRICT JUDGES' OFFICE at **(512) 854-9300** and please return the original message to us at our address show above via the U.S. Postal Service.

39



No. D-1-GN-10-004493

| | | |
|---|---|---|
| F. CLINTON BRODEN<br>Plaintiff, | § § § § | IN THE DISTRICT COURT<br>OF TRAVIS COUNTY, TEXAS |
| v. | § § | |
| TEXAS DEPARTMENT OF CRIMINAL<br>JUSTICE,<br>Defendant | § § § § § | 261ˢᵗ JUDICIAL DISTRICT |

## ORDER

On the 6ᵗʰ day of January, 2011, Plaintiff F. Clinton Broden's Petition for a Writ of Mandamus was heard in this Court. Having considered the pleadings, evidence and argument of counsel, this Court finds that Plaintiff's Petition for Writ of Mandamus should be GRANTED. Plaintiff, as the prevailing party, has filed a Motion for Attorney's Fees, which will be heard at a later date.

IT IS THEREFORE ORDERED THAT Plaintiff's Petition for Writ of Mandamus is GRANTED. Defendant argued at the hearing that this Court lacked jurisdiction over Plaintiff's Petition pursuant to Section 552.321 of the Public Information Act. Section 552.321 of the Public Information Act "confers upon the trial court the authority to issue a writ of mandamus in three circumstances: where a governmental body refuses to request an attorney general's decision on whether information is public; where the governmental body refuses to supply public information; and where a governing body refuses to supply information that the attorney general has determined is public information not excepted from disclosure." *Thomas v. Cornyn*, 71 S.W.3d 473, 481-482 (Tex. App.—Austin 2002, no pet.) (citations omitted). This Court finds that the TDCJ has "refuse[d] to supply public information," and, as such, jurisdiction in this Court is proper. The court further finds that, although there was discussion of a "plea to the

Filed in The District Court of Travis County, Texas JAN 10 2011 BP At ____ M. Amalia Rodriguez-Mendoza, Clerk

jurisdiction" at the hearing, no plea to the jurisdiction was filed by the Defendant. Accordingly, the Defendant's jurisdictional argument was considered as part of the Court's merits decision.

Further. Plaintiff has established that he made a proper request for public information and that Defendant refused to provide such information, and Defendant has failed to establish any exception to the Act. Defendant cannot withhold the requested information under the "special circumstances" exception because (1) the exception has been rejected by the Third Court of Appeals in *Tex. Dep't of Pub. Safety v. Cox Tex. Newspapers, L.P. & Hearst Newspapers, L.L.C.*, 287 S.W.3d 390 (Tex. App.—Austin 2009, pet. granted), and (2) Defendant presented no evidence to support its reliance on any exception asserted.

IT IS FURTHER ORDERED THAT Defendant TDCJ shall, no later than 10 am, Monday January 10, 2011 produce an unredacted version of Exhibit "A" attached to this order; and shall, no later than 10 am, Tuesday, January 11, 2011, provide any additional "public information," as that term is defined under the Public Information Act, that is responsive to Plaintiff's November 4, 2010 open records request and that has not already been provided by Defendant.

SIGNED on the ___10th___ day of ___January___, 2011.

_____
The Honorable John K. Dietz
Presiding Judge

# APPENDIX 4

# Woodlands Pharmacy Messages

Sale of Pentobarbital

Dear Sirs or Madams:

On September 16, 2013 The Woodlands Compounding Pharmacy sold 8 vials of 50 mg/ml Pentobarbital (2.5 grams) to James Jones. [See attachment.] Strangely, Mr. Jones identified himself as being a representative with the Texas Department of Criminal Justice Huntsville Unit Hospital.

In fact, Mr. Jones is the Senior Warden of the Texas Department of Criminal Justice Huntsville Unit. He is not a doctor. He has not medical training whatsoever. I can't imagine that he had a legal prescription for Pentobarbital when he purchased it.

The drugs will not be used in the Huntsville Unit Hospital. In fact, there is no Huntsville Unit Hospital. These drugs will be used to kill fellow human beings. These drugs will be used on October 9, 2013 to kill Michael Yowell. These drugs will be used on October 29, 2013 to kill Arthur Williams, Jr. These drugs will be used on November 12, 2013 to kill Jamie Bruce McCoskey.

I quote from your website:
Compounding gives patients drug therapy that is customized to their individualized unique needs. At TWCP, compounding pharmacists will work closely with you and your physician to prepare medication in a dosage form that has been customized to your particular needs. You are violating these ideals.

Do no harm should apply to Compounding Pharmacies, too.


Ward Larkin


https://email.1and1.com/ox6/ox.html                                      2/19/2014

000039



Disgust!

Dear Dr Lovoi

I am totally and completely aghast and disgusted to find out your company is supplying the TDCJ with the unlicensed drug to carry out it despicable executions.

What is even more abhorrent to me Sir, is that you are a Doctor, a man who took an sacred oath to preserve human life at all costs. The drug you have supplied has already been used to murder a man, who never even took anyone's life.

Your web site states under therapies, that you are able to customise medication for children "to make just about any medication taste better" which makes it easier of children to take.

Can you provide a drug that will enable the children of the men who are ritualistically murdered by the State of Texas, to cope with that, can you make a drug to bring those who are actually innocent back from the dead. No Sir you can not. Have you looked in to the eyes of a child who's father is to be realistically murdered, no Sir you have not, because had you have done so, you would not provide this drug to the TDCJ and allow them to continue this barbaric method of so called justice.

The rest of the Western world has taken the decision to stop proving drugs for this dreadful use, I urge you as a doctor, a man who should be prolonging life and making things better, a man who's oath should prevent him from being party to such heinous practices, to look at your companies policies and think again.

Your sincerely

S. Shuffield
Sent from my iPad

https://email.1and1.com/ox6/ox.html

2/19/2014

1296
Exhibit D

Did you know you were selling drugs to the Texas Department of Corrections for "MURDER?"

Please consider "NOT" selling anymore drugs to be used for executions/MURDER!

Thanks,
Bella Murphy

000041

1297
Exhibit D

please mr and mrs who are working in this pharmacy, stop selling drugs to kill HUAMAN
BEINGS
Our common dignity is concerned: Thank you. p.R.STRVEN from FRANCE

000042

1298
Exhibit D

Sir,

I'm Patrice Victor, a journalist from France. Please can you confirm (or infirm) that your company has sold a drug to TDCJ in order to apply death penalty?

Sincerely

Patrice Victor

000043

1299
Exhibit D

Drugs

Your pathetic and infantile letter to the Texan authorities asking for the
return of your lethal poison sickened me and countless others.
Whatever happened to the Hypocratic oath?
I hope that you are all god-fearing Americans who are now begging for
mercy from your redeemer - and I hope above all that it won't be
granted.


07 70 19 10 76
www.timbroadbent.com

.....et dites NON à la corrida - que la torture s'arrête
.....NO to bullfighting - stop the bloody torture

000044

1300
Exhibit D

TDCJ

Mr Lovoi

I hope you now see what dreadful and underhanded people work for the TDCJ. Their people will go to any lengths to murder those in their charge, even if its against the law.

There is a man call Michael who is due to be murdered tomorrow, I hope you get to hear about it, I hope your staff hear about it, I hope you know you were all instrumental in this mans death. Does that make you any better that any one of the man that reside within theses cursed walls, no Sir it does not.

I hope you and your colleagues sleep well, listen in to execution watch see what happens.

Sent from my iPad

So I guess you're okay with murder as long as you don't get caught?

000046

1302

Exhibit D



**Stephanie Ellis**

4 months ago-

As a supplier of the "killing drug" to TDCJ, the integrity of this pharmacy should seriously be questioned. Mr. Lovoi was perfectly fine with the transaction as long as he remained anonymous. So much for that plan huh? Hope it was worth the money for you sir. Shame on you and your pharmacy. You aren't even worthy of the star I was required to select.



**melissa monti**

4 months ago

Tomorrow I get to watch my friend get murdered by the state of Texas from drugs supplied by the Woodlands Compounding Pharmacy. I cannot believe any professional in the health care field would think it ok to intentionally end human life. What sickens me more is the fact that this pharmacy only had a problem supplying this drug to TDCJ after the fact was made public, and think they can correct this wrong by simply asking for the drug back for a refund. I am disgusted this pharmacy is in such close proximity to my house; I will NEVER give my business to this pharmacy, and neither should you! Do the right thing, Woodlands Compounding Pharmacy, and don't sell any more drugs to TDCJ that can be used as a means to execute human beings!!



**Samantha Shuffield**

4 months ago-

I am totally disgusted and aghast to find out this company is supplying the TDCJ with the unlicensed drug to carry out its despicable executions. What is even more abhorrent to me is that, the head of that company, Dr. Lovoi is a man who took a sacred oath to preserve ALL human life at all costs. The drug his company supplied has already been used to murder a man who never even took a life. their web site states that they are able to customise medication for children, and I quote; "to make just about ay medication taste better, so it is easier for children to take". Can they provide a drug that will enable the children of parents ritualistically murdered by the State of Texas to cope with the aftermath, I somehow doubt this very much. I invite you to look in to just one of those children's eyes and give your reasons Dr Lovoi, if you dare. The rest of the Western world has taken the decision to stop providing drugs for this barbaric use, come on America join them, the eyes of the world are watching.



**Pat Hartwell**

4 months ago

Recently, The Woodlands Compounding Pharmacy had compounded and sold to the Texas Department of Corrections, a drug called Pentobarbital, which is used for the sole purpose of executions. Pharmacists are bound by the "Code of Ethics", in which nowhere is listed for them to supply drugs for killing people. The Woodlands Compounding Pharmacy received $2800.00 for eight vials of this drug. Lundbeck, the former supplier, has stopped all shipments to the US when it is known that the Pentobarbital will be used to kill people.

1303

Exhibit D



**Melissa Walters**
4 months ago-
Shame, shame, shame! There is no doubt that you would have continued to sell TDC vials of compounded drugs to end the lives of many men had you not been "outed". Further shameful than that, you are only off-put by the fact that your name is now out there and the attention you are receiving to supply Texas' killing machine is less than favorable. You, as a human being, and as a "company", should be ashamed of your questionable business practices!



**David W. Collingsworth**
4 months ago
Where are the morals and ethics in our society? I understand business as usual, and if a person was allergic to certain prescriptions and needed that script compounded to be able to ingest it, then that would be your job, but to compound a drug to be used to kill with or without FDA approval???? It's just wrong all the way around. TDCJ used you to get what they needed, and you just let them. You are guilty of murder. Yes you provided the murder weapon.

1304
Exhibit D

# APPENDIX 5

## *The Pentobarbital Experiment* blog (color and black & white)

# The Pharmacist who approves the business of killing, but only under the veil of secrecy

By <u>The Pentobarbital Experiment</u>



October 6, 2013 – The Pharmacist who approves the business of killing, but only under the veil of secrecy

The state of Texas is now using compounding pharmacies to get its supply of killing drugs. The first winner of the death race is the **Woodlands Compounding Pharmacy,** which supplied 8 doses of home made Pentobarbital.

Meet the pharmacist <u>who sold the medical ethics and shamed his profession for $2,800</u>, **Mr. Jasper Lovoi, RPh**; the man who had no issue selling the poison to <u>TDCJ</u> as long as he believed the identity of his company was protected and would not be revealed.

That worked fine from September 16th, 2013 (date of his infamous transaction with TDCJ) until October 1st, 2013 when <u>three death row prisoners filed a lawsuit against TDCJ</u> for using lethal drugs acquired via an unknown, and potentially illegal, source. Subsequently, <u>TDCJ filed a response</u> on October 2nd, which revealed the details of the purchase and the identity of the vendor.

On October 4th, the <u>deceived and disappointed Mr. Lovoi sent a letter to TDCJ</u> complaining about his identity and the details of the sale having been made

000003



EXHIBIT
McCrory
7/21/14  1293
Exhibit D

public and requesting that TDCJ returns the drugs to his company. As you can tell from the letter, he is far more concerned about his business being disrupted by media calls and receiving messages than being involved in human killings in the first place!

It is one of these rare PentoX moments, and they don't occur frequently!

Undoubtedly, the Woodlands compounding pharmacy is the first but not the last one that will be fooled and tricked into selling its soul to the evil death machine.

http://thepentobarbitalexperiment.wordpress.com/2013/10/06/the-pharmacist-who-approves-the-business-of-killing-but-only-under-the-veil-of-secrecy/#more-1335

# The Pentobarbital Experiment

Danish company Lundbeck took an active and dedicated part in executions of human beings. Here is the full story: the facts and the numbers.

 **October 6, 2013**

# The Pharmacist who approves the business of killing, but only under the veil of secrecy

By The Pentobarbital Experiment



 October 6, 2013 – The Pharmacist who approves the business of killing, but only under the veil of secrecy

The state of Texas is now using compounding pharmacies to get its supply of killing drugs. The first winner of the death race is the **Woodlands Compounding Pharmacy**, which supplied 8 doses of home made Pentobarbital.

Meet the pharmacist who sold the medical ethics and shamed his profession for $2,800 (https://thepentobarbitalexperiment.files.wordpress.com/2013/10/woodlandsbill16092013.pdf), **Mr. Jasper Lovoi, RPh**; the man who had no issue selling the poison to TDCJ (http://www.tdcj.state.tx.us) as long as he believed the identity of his company was protected and would not be revealed.

That worked fine from September 16th, 2013 (date of his infamous transaction with TDCJ) until October 1st, 2013 when three death row prisoners filed a lawsuit against TDCJ (https://thepentobarbitalexperiment.files.wordpress.com/2013/10/tx_licomplaint011013.pdf) for using lethal drugs acquired via an unknown, and potentially illegal, source. Subsequently, TDCJ filed a response (https://thepentobarbitalexperiment.files.wordpress.com/2013/10/tdcj-response021013.pdf) on October

2nd, which revealed the details of the purchase and the identity of the vendor.

On October 4th, the <u>deceived and disappointed Mr. Lovoi sent a letter to TDCJ (https://thepentobarbitalexperiment.files.wordpress.com/2013/10</u> <u>/woodlandsletter041013.pdf)</u> complaining about his identity and the details of the sale having been made public and requesting that TDCJ returns the drugs to his company. As you can tell from the letter, he is far more concerned about his business being disrupted by media calls and receiving messages than being involved in human killings in the first place!

It is one of these rare PentoX moments, and they don't occur frequently!

Undoubtedly, the Woodlands compounding pharmacy is the first but not the last one that will be fooled and tricked into selling its soul to the evil death machine.

**To mark this special occasion:**

- <u>Write a review about the Woodlands Compounding Pharmacy (http://bit.ly/1fRCQpR)</u> on their Google+ page;
- Contact the American Pharmacist Association via its <u>website (http://www.pharmacist.com</u> <u>/contact-us)</u> or its <u>facebook page (http://www.facebook.com/APhAPharmacists)</u> to lodge a complaint and a request for an official statement on pharmacists' involvement in human executions;
- If you haven't already done so, <u>sign and share our petition (http://chn.ge/19lZ3TD)</u>: "David Miller & Dagmar Climo, IACP: Address the ethical issue of supplying drugs for executions" on Change.org.

As always, collective work is of the essence, and today more than ever before!

Thank you!

**PentoX**

<u>Related:</u> Read <u>The killer around the corner: the International Academy of Compounding Pharmacists (https://thepentobarbitalexperiment.wordpress.com/2013/08/05/the-killer-around-the-corner-</u> <u>the-international-academy-of-compounding-pharmacists/)</u> (August 5, 2013) and <u>Texas and compounding pharmacies: partners in crime (https://thepentobarbitalexperiment.wordpress.com/2013/10/03/texas-</u> <u>and-compounding-pharmacies-partners-in-crime/)</u> (October 3, 2013)

About these ads (https://wordpress.com/about-these-ads/)



Gray Pinstripe
Executive Ho...

The Gray
Pinstripe Exec...

$168

# About The Pentobarbital Experiment

"Lundbeck is a global pharmaceutical company engaged in the research and development, production, marketing and sale of drugs for treatment of psychiatric and neurological disorders." As the sole supplier of Pentobarbital to US departments of corrections, Danish company Lundbeck took an active and dedicated part in the executions of human beings. This is a clear violation of its ethical obligations as a European pharmaceutical laboratory. Its manufacturing plant for Pentobarbital is based in Kansas, USA. Here is the full story: the facts and the numbers brought to you by European activists dedicated to the universal abolition of the death penalty. Disclaimer: This blog was created to raise awareness and to encourage legitimate citizen actions to bring an end to the torturous executions in the USA. It does not, and never did advocate violence or retaliation against whoever participates in the legal lynchings of human beings.

This entry was posted on Sunday, October 6th, 2013 at 17:00 and tagged with American Medical Association, American Pharmacists Association, Code of ethics, Compounding, Drug, Executions, FDA, Food and Drug Administration, Houston, Lethal injection, Pentobarbital, Texas, Texas Department of Criminal Justice, United States, Woodlands Compounding Pharmacy and posted in General, Timeline. You can follow any responses to this entry through the RSS 2.0 feed.

## 2 responses to "The Pharmacist who approves the business of killing, but only under the veil of secrecy"

- *How can LloydsPharmacy help patients make the process of taking their medication safer? | The LoveLloyds Blog*

  October 8th, 2013 at 17:26
  […] The Pharmacist who approves the business of killing, but only under the veil of secrecy (thepentobarbitalexperiment.wordpress.com) […]

  0

  0

  i
  Rate This

- *Susan Chandler*

  October 14th, 2013 at 17:20
  Reblogged this on Wobbly Warrior's Blog.

  0

0

i
Rate This

Subscribe to RSS
Create a free website or blog at WordPress.com. The Elegant Grunge Theme.

ᓄ Follow

# Follow "The Pentobarbital Experiment"

Build a website with WordPress.com

# APPENDIX 6

# Prof. Humez Email

**DJ Lees**

| | |
|---|---|
| From: | donotreply@apothecarytulsa.com |
| Sent: | Wednesday, January 29, 2014 9:16 AM |
| To: | Sarah Lees; DJ Lees |
| Subject: | Apothecary Tulsa Contact Us Form Submission |

Name: Prof. Humez
Email: snintrian@earthlink.net
Phone: 4406222112
Message: Your site says nothing about pentobarbitol. Do you compound it for the state of Missouri's department of corrections, as has been publicly alleged in an AP story that ran this morning, and if so, now that that story has gone public, do you think that is prudent? Seems to me that manufacturing a drug expressly to kill people files in the face of one of those commandments Moses got from Jehovah on Sinai, but maybe I'm just being old-fashioned. Still, were I you I'd at least want to beef up my security now that you've been put in the spotlight as a likely supplier and failed to issue a flat denial. As the folks at the federal building can tell you, it only takes one fanatic with a truckload of fertilizer to make a real dent in business as usual. In your place, I'd either swear to the nation that my company didn't make execution drugs of ANY sort, and then make dang sure that's true, or else openly accept the burden of putting my employees and myself at unacceptable (and possibly uninsurable) risk. Just sayin'.

Received Time Feb. 25. 2014  1:34PM No. 0536



1305
Exhibit D